**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**UNITED STATES OF AMERICA**      *

**v.**      *      **Criminal Case No. ECH-20-034**

**CHARVEZ BROOKS**      *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**Motion to Dismiss the Indictment on**
**Second Amendment Grounds**

Last year's opinion in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), upended Second Amendment law. Before *Bruen*, courts decided Second Amendment challenges by balancing the strength of the government's interest in firearm regulation against the degree of infringement on the challenger's right to keep and bear arms. *Bruen* rejected that approach, instructing courts, instead, to consider only "constitutional text and history." 142 S. Ct. at 2128-29. If "the Second Amendment's plain text covers an individual's conduct," then under *Bruen* "the Constitution presumptively protects that conduct." *Id.* at 2129-30. To rebut the presumption, the government must show that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.* The test for historical consistency is demanding: a firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted in the founding era, when the Second Amendment was adopted.

 Under the new framework mandated by *Bruen*, the Court should dismiss the indictment against Charvez Brooks, which charges him with being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). Because possession of a firearm comes within the Second Amendment's

1

"plain text," Mr. Brooks's conduct is presumptively protected. And the government will be unable to rebut that presumption. Felon-disarmament laws, which did not appear in the United States until the 20th century, were unknown to the generation that ratified the Second Amendment.

Because § 922(g)(1) violates the Second Amendment both on its face and as applied to Mr. Brooks, the indictment must be dismissed.

## I.      Procedural background

The defendant, Charvez Brooks, is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).  The investigation of Mr. Brooks began on August 10, 2019 when Baltimore City police officers initiated a vehicle pursuit of Mr. Brooks following observation of him operating a motor vehicle on Belair Road in Baltimore, Maryland that matched the description of a vehicle involved in the shooting of a Baltimore City police sergeant.  It is alleged that during the pursuit,  Mr. Brooks threw a firearm out the window of the vehicle which was then recovered by the police.  The case began with charges in the State of Maryland.  The federal indictment was filed on January 28, 2020.  Because Mr. Brooks is charged with being a felon in possession of a firearm, his rights under the Second Amendment to the United States Constitution are implicated by this prosecution.

## II.    Legal background

### A.    Before *Bruen*, lower courts assessed Second Amendment challenges by applying means-ends scrutiny.

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held the Second Amendment codified a pre-existing "individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 592, 624 (2008). Based on an extensive historical survey, the Court concluded the right to keep and bear arms is "not limited to the carrying of arms in a militia." *Id.* at 586. The Court therefore struck down District of Columbia statutes that prohibited the possession of handguns in the home and required that any other guns in the home be kept inoperable. *Id.* at 628-34.

In *United States v. Chester*, the Fourth Circuit developed a "two-part approach" for resolving Second Amendment claims. 628 F.3d 673, 680 (4th Cir. 2010). The first step asked "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee," as it was understood "at the time of ratification." *Id.* If it did not, the challenge failed. *Id.* But if the statute did "burden[] conduct that was within the scope of the Second Amendment as historically understood," the Court then "appl[ied] an appropriate form of means-end scrutiny." *Id.* The Court employed strict scrutiny if a challenger's claim implicated "the core right" recognized in *Heller*—"the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *United States v. Chapman*, 666 F.3d 220, 224, 226 (4th Cir. 2012). Otherwise, intermediate scrutiny applied. *Id.* at 225-26. Both forms of scrutiny involved weighing the governmental interest in firearm

restrictions against the challenger's interest in keeping and bearing arms. *See United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016).

**B.** ***Bruen* replaced means-ends balancing with a test rooted solely in the Second Amendment's "text and history."**

The Supreme Court's opinion in *Bruen* disavowed the Fourth Circuit's framework, holding that courts should not "apply[] means-end scrutiny in the Second Amendment context." *Id.* at 2127. In its place, the Court adopted a "text-and-history standard" that it deemed more consistent with *Heller*'s methodology. *Id.* at 2138.

This standard directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, then "the Constitution presumptively protects that conduct." *Id.* Answering this preliminary question in *Bruen* was straightforward. At issue there was a New York law providing that to obtain a permit to carry a concealed handgun in public, an applicant had to demonstrate "proper cause," i.e., "a special need for self-protection distinguishable from that of the general community." *Id.* at 2122-23. The Court "ha[d] little difficulty concluding" that "the Second Amendment protect[ed] [the petitioners'] proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 2134. As the Court explained, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* The Second Amendment therefore "presumptively guarantee[d]" a right to carry firearms in public, and New York's "proper cause" requirement, which infringed that right, could pass constitutional muster only if the state overcame the presumption. *Id.* at 2129-30, 2135.

To rebut the presumption of unconstitutionality, *Bruen* held, "the government may not simply posit that [a] regulation promotes an important interest." *Id.* at 2126. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical

tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132.

The Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136 (emphasis in original). For that reason, the relevant "historical tradition" for purposes of a federal gun regulation is that which existed in 1791, when the Second Amendment was ratified. *Id.* at 2136. Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id.* at 2131-32. *Bruen* cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Id.*

Conversely, courts must "guard against giving post-enactment history more weight than it can rightly bear." *Id.* Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Id.* But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *See id.* at 2137 ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75

years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."). Evidence from "the mid- to late-19thcentury" provides little "insight into the meaning of the Constitution in [1791]." *Id.* Courts should therefore credit such history to the extent it provides "confirmation" of prior practice but should otherwise afford it little weight. *Id.* That is because "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in original); *see also id.* at 2154 n.28 (ignoring "20th-century historical evidence" because it is too temporally remote).

The Court in *Bruen* held that because New York could not point to a robust tradition of regulations similar to the proper-cause requirement, the state's statute violated the Second Amendment. *Id.* at 2138-56. In reaching its conclusion, the Court did not elaborate a comprehensive scheme for evaluating historical evidence, but it did stake certain guideposts for lower courts to follow.

       1.    **Statutes addressing longstanding societal problems are subject to more rigorous scrutiny than statutes addressing historically "unprecedented" challenges.**

To begin, the Court explained that the standard for reviewing historical evidence differs depending on what kind of problem a statute is intended to remedy—specifically, whether that problem is old or new.

In "some cases," where a challenged statute "addresses a general societal problem that has persisted since the 18th century," the historical "inquiry will be fairly straightforward." *Id.* at 2131; *see also id.* at 2131-32 (describing inquiry as "simple" and "straightforward"). To defend such statutes, the government must point to a tradition of "distinctly similar historical regulation[s]." *Id.* at 2131. If "the Founders themselves could have adopted" a particular regulation to "confront" a problem that existed in 1791, but did not do so, then that regulation

6

is unconstitutional today. *Id.* Conversely, statutes addressing longstanding problems are likely *un*constitutional if (1) "earlier generations addressed the societal problem, but did so through materially different means," or (2) some jurisdictions in the founding era attempted to enact laws analogous to the challenged regulation, but "those proposals were rejected on constitutional grounds." *Id.*

In "other cases," a modern statute will be aimed at "unprecedented societal concerns or dramatic technological changes" that would have been "unimaginable at the founding." *Id.* at 2132. Challenges to these statutes "may require a more nuanced approach." *Id.* Instead of asking whether the modern statute and historical precursors are "*distinctly* similar," courts should ask whether they are "*relevantly* similar." *Id.* (emphasis added). *Bruen* identified "at least two metrics" to use in the "relevantly similar" inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. In other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [the 'how'] and whether that burden is comparably justified [the 'why'] are *central* considerations when engaging in an analogical inquiry." *Id.* (emphasis in original).

This latter approach to *Bruen*'s historical inquiry—the "relevantly similar" standard—is less difficult for the government to satisfy. But courts may employ that approach only when the challenged statute is geared toward a societal problem that was "unimaginable at the founding." *Id.* It is not available when the challenged statute "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131; *see, e.g.*, *Range v. Att'y Gen.*, 69 F.4th 96, 103 (3d Cir. 2023) (en banc) ("To be compatible with the Second Amendment, regulations targeting longstanding problems must be 'distinctly similar'

to a historical analogue. But 'modern regulations that were unimaginable at the founding' need only be 'relevantly similar' to one."); *United States v. Marique*, No. CR 22-00467-PJM, 2023 WL 5338069, at *2 (D. Md. Aug. 18, 2023) ("When evaluating evidence of a historical tradition of firearms regulation, *Bruen* instructs courts to use different tests depending on the kind of problem a regulation addresses. Where a regulation 'addresses a general societal problem that has persisted since the 18th century,' the government must point to a tradition of 'distinctly similar historical regulations' when defending the statute. Conversely, if a modem statute is aimed at 'unprecedented societal concerns or dramatic technological changes' not present at the founding, courts are directed to ask whether the modern statute and historical precursors are 'relevantly similar' rather than 'distinctly similar.'").

At the threshold, therefore, courts faced with a *Bruen* challenge must identify the problem at which a statute is aimed, and then determine whether that problem existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes. 142 S. Ct. at 2132. The answer to this question dictates whether courts apply the "distinctly similar" test or the "relevantly similar" test. *See United States v. Daniels*, 77 F.4th 337, 343 (5th Cir. 2023) ("Before we decide whether § 922(g)(3) is consistent with our tradition of gun regulation, we must first ask a methodological question: What kind of similarity are we looking for? 'Distinct' similarity or a less precise 'relevant' similarity? That depends on whether § 922(g)(3) 'addresses a general societal problem that has persisted since the 18th century' or an 'unprecedented societal concern' that the Founding generation did not experience.").

### 2.    The government must identify a "well-established and representative" tradition of comparable regulations.

Whether based on "distinctly similar" precursors or merely "relevantly similar" historical analogues, the "comparable tradition of regulation" must be robust. To carry its burden, the government must show that the historical tradition on which it relies is "well-established and representative." *Bruen*, 142 S. Ct. at 2133; *see also id.* at 2137 (explaining that "a governmental practice" can "guide [courts'] interpretation of an ambiguous constitutional provision" *if* that practice "has been open, widespread, and unchallenged since the early days of the Republic").

A handful of "outlier[]" statutes or cases from a few "outlier jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156. The Court expressed "doubt," for instance, that statutes from only three of the original thirteen colonies would establish a relevant tradition. *Id.* at 2142. And in evaluating 19th-century "surety laws," which New York argued were precursors to its proper-cause requirement, the Court discounted two of those ten laws—which were most similar to New York's—as unrepresentative. *See id.* at 2148 n.24; *see also Atkinson*, 2023 WL 4071542, at *9 (Wood, J., dissenting) ("[T]he historical analogues must be abundant, though they need not appear in every jurisdiction.").

9

### 3. The government bears the burden of demonstrating that a statute is consistent with the Nation's historical tradition.

Finally, *Bruen* emphasized that "the burden falls on [the government] to show that [a statute] is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2135. Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. In consequence, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." *Id.* at 2150.

And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11. Put differently, the tie goes to the Second Amendment claimant. *See also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]").

### III.      Analysis

### A.      Section 922(g)(1) fails *Bruen*'s "text-and-history" standard."

Under the framework announced in *Bruen*, § 922(g)(1) violates Mr.Brooks' Second Amendment right to keep and bear arms. The amendment's "plain text" does not differentiate between felons and non-felons, and a total prohibition on firearm possession by felons therefore presumptively violates the Second Amendment. The government cannot rebut that presumption. Felons' access to firearms is "a general societal problem that has persisted since the 18th century," and so the government must show a robust tradition of regulations "distinctly similar" to § 922(g)(1). *Id.* at 2131. Felon-disarmament statutes, however, did not appear until the 20th century; the "Founders themselves could have adopted" felon-disarmament laws, but did not do so. *Id.* Because there was no "historical tradition," circa 1791, of regulations "distinctly similar" to § 922(g)(1), that statute violates the Second Amendment. *Id.*

### 1.      The Second Amendment's "plain text" protects Mr. Brooks' possession of a .25 caliber pistol.

*Bruen* directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. The answer to that question is easy in Mr. Brooks' case. The Second Amendment's operative clause contains three textual elements: it protects the right of (1) "the people" to (2) "keep and bear" (3) "Arms." Here, Mr. Brooks satisfies all three elements. *See id.* at 2134-35 (analyzing these three elements in turn).

### a.      "Arms"

The indictment alleges Mr. Brooks possessed a .25 caliber pistol. ECF 1 at 1. A pistol is clearly a firearm and among the "Arms" protected by the Second Amendment. (emphasis added)).

### b.       "Keep and bear"

Possession of a Second Amendment-protected item, the conduct alleged in the indictment, easily qualifies as "keep[ing]" arms. *Heller* defines "keep" as "to retain; not to lose," "to have in custody," and "to hold; to retain in one's power or possession"—in short, to "have weapons." *Id.* at 582.

### c.       "The people"

Finally, Mr. Brooks is part of "the people" protected by the Second Amendment. Just as that amendment does not "draw[] a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2134, it does not draw a felon/non-felon distinction. "Nothing in the Second Amendment's text" suggests that those who have been convicted of a felony are unentitled to the amendment's protection. *Id.*

*Heller* confirms this conclusion. Construing the words "the people," the *Heller* Court said "the term unambiguously refers to *all* members of the political community, *not an unspecified subset*." 554 U.S. at 580 (emphasis added). It interpreted "the people" to refer to all "persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* Thus the Second Amendment right "is exercised individually and belongs to *all* Americans." *Id.* at 581 (emphasis added). Interpreting "the people" to exclude felons would conflict with that principle.

It follows that even "dangerous felons" "are indisputably part of 'the people'" for Second Amendment purposes. *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022); *see also, e.g.*, *Range*, 69 F.4th at 101-03 (holding, post-*Bruen*, that felons are among "the people" safeguarded by the Second Amendment); *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *20-21 (S.D. Miss. June 28, 2023) (same);

*United States v. Melendez-Machado*, No. EP-22-CR-00634-FM, 2023 WL 4003508, at *3-4 (W.D. Tex. June 14, 2023) (same); *United States v. Ware*, No. 22-CV-30096-SPM, 2023 WL 3568606, at *4-5 (S.D. Ill. May 19, 2023) (same); *United States v. Lowry*, No. 1:22-CR-10031-CBK, 2023 WL 3587309, at *3 (D.S.D. May 5, 2023) (same); *United States v. Martin*, No. 2:21-CR-00068, 2023 WL 1767161, at *2 (D. Vt. Feb. 3, 2023) (same); *United States v. Barber*, No. 4:20-CR-384-SDJ, 2023 WL 1073667, at *6 (E.D. Tex. Jan. 27, 2023) (same); *United States v. Hester*, No. 1:22-cr-20333-RNS, ECF 39 (S.D. Fla. Jan. 27, 2023) (same); *Campiti v. Garland*, ___ F. Supp. 3d ___, 2023 WL 143173, at *3 (D. Conn. Jan. 10, 2023) (same); *United States v. Goins*, No. 522CR00091GFVTMAS1, 2022 WL 17836677, at *4-7 (E.D. Ky. Dec. 21, 2022) (same); *United States v. Carrero*, No. 2:22-CR-00030, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022) (same); *United States v. Price*, No. 2:22-CR-00097, 2022 WL 6968457, at *7 (S.D.W. Va. Oct. 12, 2022) (same); *United States v. Coombes*, No. 22-CR-00189-GKF, 2022 WL 4367056, at *4 (N.D. Okla. Sept. 21, 2022) (same); *United States v. Zelaya Hernandez*, No. 3:23-CR-0056-B, 2023 WL 4161203, at *3-4 (N.D. Tex. June 23, 2023) (same); *United States v. Holmes*, No. CR 23-20075, 2023 WL 4494340, at *1 (E.D. Mich. July 12, 2023) (same); *United States v. Davila*, No. 23-CR-292 (JSR), 2023 WL 5361799, at *2 (S.D.N.Y. Aug. 22, 2023) (same); *United States v. Quailes*, No. 1:21-CR-0176, 2023 WL 5401733, at *7-8 (M.D. Pa. Aug. 22, 2023); *United States v. Gates*, 2023 WL 5748362, at *4-5 (N.D. Ill. Sept. 6, 2023) (same).

In addition, *Heller* explained that "the people" is a "term of art" that bears a uniform meaning across the First, Second, Fourth, and Ninth Amendments. *Id.* at 580. The result is that, if a felony conviction deprives someone of his Second Amendment right to bear arms, it would also deprive him of his First Amendment right to petition the government for redress

of grievances and his Fourth Amendment right to be free from warrantless searches of his home. Like the en banc Third Circuit in *Range*, this Court should reject that proposition. 69 F.4th at 102 ("Unless the meaning of the phrase 'the people' varies from provision to provision—and the Supreme Court in <u>Heller</u> suggested it does not—to conclude that Range is not among 'the people' for Second Amendment purposes would exclude him from those rights as well."); *see also, e.g.*, *Barber*, 2023 WL 1073667, at \*6 (same); *United States v. Williams*, No. 121CR00362LMMLTW, 2022 WL 18285005, at \*2 (N.D. Ga. Nov. 14, 2022) (same); *Lowry*, 2023 WL 3587309, at \*3 & n.34 (D.S.D. May 5, 2023) (same); *Ware*, 2023 WL 3568606, at \*5 (same); *United States v. Perez-Gallan*, No. PE:22-CR-00427-DC, 2022 WL 16858516, at \*9 (W.D. Tex. Nov. 10, 2022) (same, in 18 U.S.C. § 922(g)(8) case).

Notwithstanding this straightforward interpretation of the Second Amendment's "plain text," the government has argued in other cases that "the people" comprises only *law-abiding* people. This argument derives from a comment *Heller* made when determining the proper standard of review for Second Amendment claims. In rejecting the "interest-balancing inquiry" proposed by Justice Breyer's dissent, the *Heller* majority explained that the Second Amendment "is the very *product* of an interest balancing by the people." 554 U.S. at 634-35 (emphasis in original). Judges therefore lack authority to "conduct [that balancing] anew" or "decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* (emphasis in original). And regardless, the Court wrote, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. This latter sentence, the argument goes, limits the right to keep and bear arms to "law-abiding, responsible citizens."

14

This argument misreads *Heller*. By beginning the quoted passage with "whatever else it leaves to future evaluation," the *Heller* Court made clear that its reference to "law-abiding, responsible citizens" established a Second Amendment floor, not a ceiling. The Court held that law-abiding, responsible citizens have a right to possess firearms, but it did not address whether—much less rule out the conclusion that—other people have that right, too. Rather, it expressly left that question "to future evaluation." *Id. Heller*'s "law-abiding" statement was not meant to amend, sub silentio, its holding that "the people" are all members of the national community, and "not an unspecified subset." *Id.* at 580.

As the Sixth Circuit has put it, *Heller* "conclusively established [that] the Second Amendment applies to law-abiding and peaceable citizens *at the very least*." *Stimmel v. Sessions*, 879 F.3d 198, 204-05 (6th Cir. 2018) (emphasis added). *Heller*'s "law-abiding" language does not "demarcate [the Second Amendment's] outer limit" or "exclude[]" anyone from the amendment's coverage, *id.*; it merely establishes that certain people do fall within the amendment's reach. *See Gates*, 2023 WL 5748362, at *4 ("*Heller* decided only what it needed to decide. Each reference to 'law-abiding' citizens did not constitute part of a broader *holding* that felons are categorically not amongst the "people" under the Second Amendment." (emphasis in original)).

*Heller*'s qualifying language is clear, but to the extent it was ambiguous, *Bruen* dispelled the ambiguity. The passage cited above references law-abiding, responsible citizens' right to use arms "in defense of hearth and home." If that passage were meant to mark off the outer edges of the Second Amendment right, then even law-abiding, responsible citizens would have no right to use firearms *outside* the home. But *Bruen* held the Second Amendment right does extend outside the home, and the Court in *Bruen* gave no hint that it

15

believed it was contradicting *Heller* in that regard. Thus *Bruen* confirms that it would be a mistake to read *Heller*'s "law-abiding, responsible citizens" language as a limitation on the Second Amendment.

The government has argued elsewhere that other portions of *Bruen* demonstrate Second Amendment rights are "limited" to law-abiding citizens. It is true that at several points, *Bruen* describes its holding by using the term "law-abiding." *See, e.g.*, 142 S. Ct. at 2156 ("New York's proper-cause requirement violates the [Second] Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms.").

But *Bruen* repeated the "law-abiding" label because the petitioners in that case alleged, "[a]s set forth in the pleadings below," that they were "law-abiding, adult citizens," and the Court granted certiorari to decide only whether "New York's denial of *petitioners'* license applications violated the Constitution." *Id.* at 2124-25 (emphasis added). No other questions were before the Court in *Bruen*, and at no point did the Court say Second Amendment rights are limited to law-abiding citizens. *See Range*, 69 F.4th at 101 ("First, the criminal histories of the plaintiffs in *Heller, McDonald*, and *Bruen* were not at issue in those cases. So their references to 'law-abiding, responsible citizens' were dicta."); *United States v. Lewis*, No. CR 22-0222-WS, 2023 WL 4604563, at *6 (S.D. Ala. July 18, 2023) ("*Bruen* [did not] purport[] to confine the Second Amendment to law-abiding, responsible citizens. It had no need, and perhaps no ability, to issue such a holding, since the individual plaintiffs were undisputedly 'ordinary, law-abiding' adult citizens."); *United States v. Pierre*, No. 1:22-cr-20321-JEM, ECF 53 at 17 (S.D. Fla. Nov. 28, 2022) ("[I]t is no surprise that [*Bruen*] used the term 'law-abiding' because that was the factual scenario the Court was considering. Indeed,

16

there would have been no reason for the Court in *Bruen* to address or even consider whether non-law-abiding citizens were part 'of the people.' It did not, and *Bruen*'s references to 'law abiding' do not support the Government's position."); *Ware*, 2023 WL 3568606, at *5 ("The language 'law-abiding' as used in both *Heller* and *Bruen* does not alter who the Second Amendment applies to, but rather describes the individuals involved in those cases.").

Indeed, *Bruen* reaffirmed *Heller*'s conclusion that the Second Amendment right belongs to "'*all* Americans.'" 142 S. Ct. at 2156 (emphasis added) (quoting *Heller*, 554 U.S. at 581). That statement cannot be reconciled with the government's view that *Bruen* (implicitly) limits the arms right to law-abiding citizens. *Bruen* also repeated *Heller*'s instruction that courts should give "the Second Amendment's language" its "'normal and ordinary' meaning." *Id.* at 2127 (quoting *Heller*, 554 U.S. at 576). There is nothing normal or ordinary about reading "the people" to mean "*law-abiding* people." And anyway, the government's argument proves too much. *Bruen* held "that *ordinary*, law-abiding citizens have [the] right to carry handguns publicly for their self-defense." *Id.* at 2122 (emphasis added). If the word "law-abiding" in that sentence limits the Second Amendment's scope, then the word "ordinary" must do so, too. But surely the government does not believe *un*ordinary citizens lack Second Amendment rights. The Supreme Court cannot have meant to exclude anyone deemed abnormal from exercising a fundamental, enumerated constitutional right.

Finally, "the phrase 'law-abiding, responsible citizens' is as expansive as it is vague." *Range*, 69 F.4th at 102; *see also Bullock*, 2023 WL 4232309, at *29 (same). As the Fifth Circuit has observed, that phrase

> admits to no true limiting principle. Under the Government's reading, Congress could remove 'unordinary' or 'irresponsible' or 'non-law-abiding'

people—however expediently defined—from the scope of the Second
Amendment. Could speeders be stripped of their right to keep and bear arms?
Political nonconformists? People who do not recycle or drive an electric
vehicle? One easily gets the point: Neither *Heller* nor *Bruen* countenances such
a malleable scope of the Second Amendment's protections; to the contrary, the
Supreme Court has made clear that 'the Second Amendment right is exercised
individually and belongs to all Americans." *Heller*, 554 U.S. at 581.

*United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023) (holding 18 U.S.C. § 922(g)(8)

facially unconstitutional). Thus adopting a "law-abiding, responsible citizens" limitation

"devolves authority to legislators to decide whom to exclude from 'the people.'" *Range*, 69

F.4th at 102. That approach—which "gives legislatures unreviewable power to manipulate

the Second Amendment by choosing a label"—conflicts with *Bruen*'s "warning against

'judicial deference to legislative interest balancing.'" *Id.* at 103 (quoting 142 S. Ct. at 2131).

Mr. Brooks, who is an American citizen, is part of the United States' "national

community." *Heller*, 554 U.S. at 580. He is therefore among "the people" protected by the

Second Amendment.

> **2.    The government will be unable to show that § 922(g)(1) is
> consistent with the United States' historical tradition of firearm
> regulation.**

Because "the Second Amendment's plain text covers [Mr.Brooks'] conduct, the

Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. To rebut the

presumption, the government must establish that § 922(g)(1) "is consistent with this Nation's

historical tradition of firearm regulation." *Id.* The government will be unable to do so.

Section 922(g)(1) is therefore unconstitutional, both on its face and as applied to Mr. Brooks.

### a. The "distinctly similar" test applies in a challenge to § 922(g)(1).

As explained above, the threshold question in *Bruen*'s historical inquiry is whether the problem addressed by § 922(g)(1) is longstanding or of more recent provenance. The answer is clear: the "general societal problem" at which § 922(g)(1) is directed—i.e., felons' access to guns—"has persisted since the 18th century." *Id.* at 2131. As a result, § 922(g)(1) is unconstitutional unless the government shows a robust tradition of "distinctly similar" regulations as of 1791, when the Second Amendment was ratified. *Id.*; *see Harrison*, 2023 WL 1771138, at *6 ("[T]he United States has not identified a single historical law that is 'distinctly similar' to § 922(g)(3)—which *Bruen* suggests is dispositive.").

The government cannot defend § 922(g)(1) through the "relevantly similar" test, which is reserved for statutes aimed at "unprecedented" problems that would have been "unimaginable" at the founding. *Bruen*, 142 S. Ct. at 2132. After all, the potential danger posed by felons' access to firearms would hardly have been foreign to the Founders. *See Range*, 69 F.4th at 103 (explaining that, in contrast to "regulations targeting longstanding problems," which "must be 'distinctly similar' to a historical analogue," "'modern regulations that were unimaginable at the founding' need only be 'relevantly similar' to one").

Although *Bruen* did not expressly define "distinctly similar," it indicated the standard is a stringent one. The only historical regulation *Bruen* identified as sufficiently similar to New York's proper-cause requirement was an 1871 Texas law forbidding "anyone from 'carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person.'" 142 S. Ct. at 2153 (citing 1871 Tex. Gen. Laws § 1). This "reasonable grounds" requirement was essentially identical to New York courts'

interpretation of that state's proper-cause standard. *See id.* at 2123-24 & n.2.

> **b.**   **Section 922(g)(1) violates the Second Amendment on its face.**

Given the high degree of fit required by *Bruen*'s "distinctly similar" test, § 922(g)(1) is facially constitutional only if the government can identify a historical tradition of laws that denied firearms to *felons* as a class. No such statutes appear in the 18th- or 19th-century record.

What is today § 922(g)(1) traces its origins to 1938, when Congress passed the Federal Firearms Act, prohibiting certain felons from receiving firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing c. 850, § 2(f), 52 Stat. 1250, 1251 (1938)). At that time, the statute "covered only a few violent offenses," *id.*, prohibiting receipt of a firearm by those convicted of crimes such as murder, rape, kidnapping, and burglary, *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). Not until 1961 did Congress amend the statute to cover receipt by "*all* felons." *Skoien*, 614 F.3d at 640 (emphasis in original) (citing Pub. L. 87–342, 75 Stat. 757). Seven years later, "Congress changed the 'receipt' element of the 1938 law to 'possession,' giving 18 U.S.C. § 922(g)(1) its current form." *Id.* Thus § 922(g)(1) "is firmly rooted in the twentieth century," *Booker*, 644 F.3d at 24—roughly 150 years after adoption of the Second Amendment. The Court in *Bruen* said it would not even "address any of the 20th-century historical evidence brought to bear by respondents or their *amici*," since evidence of that type "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." 142 S. Ct. at 2154 n.28. Regulations of such recent vintage cannot establish a historical tradition unless they "confirm[]" earlier practice. *Id.* at 2137.

>           **c.      Section 922(g)(1) violates the Second Amendment as
>                     applied to Mr. Brooks.**

Even assuming § 922(g)(1) is facially constitutional, it violates the Second

Amendment as applied to Mr. Brooks. Mr. Brooks' criminal history indicates he has

§ 922(g)(1) predicate convictions for second-degree assault (2 times), unlawfully possessing

a controlled substance (three times), theft under $10,000 (2 times), Burglary First Degree.

The government will be unable to demonstrate that, around the time of the founding, there

existed a robust tradition of disarming people convicted of these types of crimes (assault,

burglary, drugs, etc.). Because the historical record does not show that the founding

generation disarmed people like Mr. Brooks, § 922(g)(1) is unconstitutional as applied. *See

Range*, 69 F.4th at 104-06 & n.9 (holding § 922(g)(1) violates Second Amendment as applied

to defendant with conviction for food-stamp fraud); *United States v. Harper*, No. 1:21-CR-

0236, 2023 WL 5672311, at *1, 12-13 (M.D. Pa. Sept. 1, 2023) (same, for defendant with "at

least thirteen prior felony" convictions, including "multiple armed robberies and drug

trafficking convictions"); *Bullock*, 2023 WL 4232309, at *2, 21-25, 28-31 & n.2 (same, for

defendant with convictions for manslaughter, aggravated assault, fleeing law enforcement,

and attempted aggravated assault of a law enforcement officer); *United States v. Forbis*, No.

4:23-cr-133-GKF, ECF 37 at 1-2 (N.D. Okla. Aug. 17, 2023) (same, for defendant with

convictions for possessing methamphetamine and driving under the influence); *United States

v. Quailes*, No. 1:21-CR-0176, 2023 WL 5401733, at *1, 11-12 (M.D. Pa. Aug. 22, 2023)

(same, for defendant with four convictions for possession of heroin and cocaine with intent to

distribute).

**B.      Neither *Heller* nor pre-*Bruen* Fourth Circuit case law forecloses Mr. Brooks' claim.**

In other *Bruen* litigation, the government has argued § 922(g)(1) remains constitutional post-*Bruen* because of (1) dictum about felon-disarmament laws in *Heller* and (2) the Fourth Circuit's post-*Heller* treatment of § 922(g)(1). Neither establishes § 922(g)(1)'s constitutionality.

**1.      The *Heller* dictum**

After completing its historical survey, and before assessing the constitutionality of the District of Columbia's statutes, the Court in *Heller* inserted some "precautionary language." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 688 (6th Cir. 2016) (en banc). The Court wrote that the Second Amendment right "is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. It went on:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27. In an accompanying footnote, the Court described these prohibitions as "presumptively lawful regulatory measures." *Id.* at 627 n.26.

In previous *Bruen* challenges to § 922(g)(1), the government has argued this portion of *Heller* conclusively establishes that felon-disarmament laws are consistent with the Second Amendment. That view is mistaken. The question of felon-disarmament laws' constitutionality was not before the Court in *Heller*, and any statements in the opinion addressing that question are therefore "dicta." *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *accord Tyler*, 837 F.3d at 686-87 (describing *Heller*'s "presumptively

lawful" language as "dictum"); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (same).

Of course, lower courts should "give great weight to Supreme Court dicta," *N.L.R.B. v. Bluefield Hosp. Co., LLC*, 821 F.3d 534, 541 n.6 (4th Cir. 2016), at least when the Court's opinion engages in an "extended discussion" of an issue, the Court gives "full and careful consideration to the matter," and the issue is "important, if not essential, to the Court's analysis," *Hengle v. Treppa*, 19 F.4th 324, 346-47 (4th Cir. 2021). Ultimately, however, lower courts "are not bound by dicta or separate opinions of the Supreme Court." *Myers v. Loudoun Cty. Pub. Sch.*, 418 F.3d 395, 406 (4th Cir. 2005). Where the Supreme Court's discussion of an issue is "peripheral" or "cursory," courts need not defer to it. *Hengle*, 19 F.4th at 347. The Fourth Circuit has therefore declined to follow Supreme Court dicta that is "unaccompanied by any analysis from which [it] might gain insight into the Court's reasoning." *In re Bateman*, 515 F.3d 272, 282 (4th Cir. 2008); *see also id.* at 283 (refusing to "afford[] talismanic effect" to unexplained Supreme Court dicta).

*Heller*'s discussion of "presumptively lawful regulatory measures" is exactly the kind of Supreme Court dicta unentitled to "talismanic effect." *Id.* at 283. That dictum was "unaccompanied by any analysis," *id.*, and was—at best—"peripheral" to the questions at issue, *Hengle*, 19 F.4th at 347. The *Heller* Court provided no "extended discussion," or even abbreviated discussion, of felon-disarmament laws. *Hengle*, 19 F.4th at 346. While the Court described felon-disarmament laws as "longstanding," 554 U.S. at 626, it "never actually addressed the historical pedigree" of those laws, *Kanter v. Barr*, 919 F.3d 437, 445 (7th Cir. 2019). Indeed, the Court prefaced its reference to "longstanding prohibitions on the possession of firearms by felons" by noting that it "d[id] not undertake an exhaustive

23

historical analysis today of the full scope of the Second Amendment." *Heller*, 554 U.S. at
626.

Heller itself indicates its dicta should not control here. Dissenting in *Heller*, Justice
Breyer criticized the reference to longstanding felon-disarmament laws as "*ipse dixit*," noting
that the majority "fail[ed] to cite any colonial analogues" to such statutes. 554 U.S. at 721-22.
The majority responded that there would "be time enough to expound upon the historical
justifications for the exceptions we have mentioned if and when those exceptions come
before us." *Id.* at 635. This rejoinder suggests the *Heller* Court assumed "felons can be
deprived of the [Second Amendment] right *if that deprivation is consistent with history and
tradition*." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous
Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 252 (2020) (emphasis added). The
Court's allusion to "expound[ing] upon the historical justifications" for felon-disarmament
laws would make no sense if the Court believed felons could be disarmed *regardless* of
whether history supported that exclusion. As the *Bullock* court put it, "[Heller] reassured us
that 'there will be time enough to expound upon the historical justifications for the exceptions
we have mentioned if and when those exceptions come before us.' After *Bruen*, that time has
arrived." 2023 WL 4232309, at *19 (quoting 554 U.S. at 635).

Regardless, even if the *Heller* dictum might once have warranted deference, it no
longer does today. In the sentence before its reference to "longstanding prohibitions" on
felons' possession of firearms, the *Heller* Court wrote that "the majority of the 19th-century
courts to consider the question held that prohibitions on carrying concealed weapons were
lawful under the Second Amendment or state analogues." 554 U.S. at 626. Fourteen years
later, the Court in *Bruen* confronted a challenge to a New York law severely restricting the

24

concealed carry of firearms in public—another of the "presumptively lawful" measures identified in *Heller*. *See United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) ("*Heller* lists several examples of what the Court deemed to be 'presumptively lawful regulatory measures,' including prohibitions on carrying concealed weapons."). If *Heller*'s casual description of concealed-carry bans as constitutional were dispositive, *Bruen* would have been an easy case: the Court would simply have deferred to *Heller*'s approval of such laws and upheld New York's statute on that basis. But of course, that is not what the Court did. The Court instead undertook an exhaustive historical survey of the law governing concealed carry, from medieval England up to late-19th-century America. *Id.* at 2135-56. And "[a]t the end of th[at] long journey through the Anglo-American history of public carry," *id.* at 2156, the Court reached a conclusion different from its offhand remark in *Heller*, holding that laws burdening concealed carry are *un*constitutional, at least where the state also forbids open carry. *See id.* at 2144-47, 2150.

The lesson for § 922(g)(1) is clear. Rather than treating *Heller*'s "longstanding prohibitions" passage as dispositive, this Court must actually investigate the historical record to determine whether felon-disarmament laws are in fact consistent with the Second Amendment. Indeed, the need for historical inquiry is even greater with respect to felon-disarmament laws than it was with respect to concealed-carry bans in *Bruen*. *Heller* seemingly blessed the constitutionality of concealed-carry prohibitions by citing four sources—two cases and two treatises. 554 U.S. at 626. For felon-disarmament laws, by contrast, it cited no sources at all. *Id.* at 626-27. If the four sources supporting concealed-carry bans were insufficient to stave off a fuller historical analysis in *Bruen*, then it

necessarily follows that *Heller*'s cursory approval of felon-disarmament laws does not end the inquiry.

The Seventh Circuit made this point in a recent Second Amendment challenge to § 922(g)(1), where the government asked the court to "sidestep *Bruen*" by simply invoking *Heller*'s "oft-quoted dicta." *Atkinson*, 2023 WL 4071542, at *3. The court declined, concluding it must "roll[] up its sleeves" and "undertake the text-and-history inquiry the [*Bruen*] Court so plainly announced and expounded upon at great length." *Id.* This Court must do the same. *See also Range*, 69 F.4th at 103-04 (rejecting government's request to uphold § 922(g)(1) based on *Heller*'s dictum); *Bullock*, 2023 WL 4232309, at *18 (dismissing "presumptively lawful" dicum as "'judicial lawmaking'" and declining to follow it because "[f]ederal courts are only permitted to rule upon an actual 'case or controversy,' and lack jurisdiction to render merely advisory opinions beyond the rulings necessary to resolve a dispute," as *Heller* did).

### 2.      The Fourth Circuit's pre-*Bruen* cases upholding § 922(g)(1)

Nor do the Fourth Circuit's post-*Heller* § 922(g)(1) cases survive *Bruen*.

Following *Heller*, the Fourth Circuit in *Chester* laid out its two-step, means-ends inquiry for Second Amendment claims. 628 F.3d at 680-83. That case involved 18 U.S.C. § 922(g)(9), which makes it illegal to possess a firearm after conviction for a "misdemeanor crime of domestic violence." *Id.* at 677. Two years later, in *United States v. Moore*, 666 F.3d 313, 315 (4th Cir. 2012), the Fourth Circuit for the first time addressed a Second Amendment challenge to a statute—§ 922(g)(1)—that is among the "presumptively lawful regulatory measures" identified in *Heller*.

*Moore* noted that *Heller* said "'nothing in [that] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons,'" which *Heller*

characterized as "'presumptively lawful regulatory measures.'" *Id.* at 317-18. The *Moore* court expressed confusion about this aspect of *Heller*, observing that it was "unclear . . . whether *Heller* was suggesting that 'longstanding prohibitions' such as these [firearm possession by felons] were historically understood to be valid limitations on the right to bear arms or did not violate the Second Amendment for some other reason." *Id.* at 318. But the court felt no need to resolve that question. Because "the presumption of constitutionality . . . govern[ed]," the court did "not pursue an analysis of the historical scope of the Second Amendment right," as it otherwise would have at *Chester*'s step one. *United States v. Pruess*, 703 F.3d 242, 246 n.3 (4th Cir. 2012) (discussing *Moore*). Instead, it simply concluded "the *Chester* analysis is more streamlined when a presumptively lawful regulatory measure is under review." *Moore*, 666 F.3d at 318. Specifically, *Moore* held *Heller*'s reference to "presumptively lawful" felon-disarmament laws "negates a facial challenge to a felon in possession statute like § 922(g)(1)." *Id.*

This conclusion rested solely on the "presumptively lawful" passage in *Heller*; it was not rooted in a *Chester*-step-one determination that felons are outside "the scope of the Second Amendment as historically understood." 628 F.3d at 680; *see Hamilton v. Pallozzi*, 848 F.3d 614, 624 (4th Cir. 2017) ("The streamlined portion of the analysis as explained in *Moore* is that for a presumptively lawful regulation, at the first step of the Second Amendment inquiry, we need not undertake an extensive historical inquiry to determine whether the conduct at issue was understood to be within the scope of the Second Amendment at the time of ratification."). As explained in the previous section, however, *Bruen* clarifies that uncritical deference to *Heller*'s "presumptively lawful" language is no longer proper. Instead, courts must subject every type of firearm regulation—even those on *Heller*'s "presumptively lawful" list—to

27

rigorous scrutiny to determine whether they are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Because the Fourth Circuit has never conducted that historical inquiry for felon-disarmament laws, its pre-*Bruen* cases do not resolve Mr. Brooks' challenge.

### C.      The Court should reject the government's efforts to define the relevant historical tradition at a high level of generality.

In previous *Bruen* litigation, the government has argued § 922(g)(1) is constitutional because it fits within a supposed historical tradition permitting legislatures to take firearms away from "dangerous" or "unvirtuous" people, or people who demonstrated "disrespect for the law." The government seeks to support this argument by citing founding-era laws disarming slaves, Native Americans, certain religious minorities, and citizens who refused to swear a loyalty oath to the state. Based on these disparate regulations of discrete groups, the government deduces a broader principle: that the Second Amendment, as it was understood in 1791, did not protect members of *any* group whom a legislature might rationally deem "dangerous" or "unvirtuous," even if that specific group (such as felons) was never disarmed at the founding.

This argument operates at too high a level of generality.  *Bruen* demonstrates that in carving out exceptions to "the Second Amendment's unqualified command," *id.* at 2126, courts should proceed cautiously, defining those exceptions narrowly and concretely, to ensure they are in fact consistent with America's historical tradition of firearm regulation.

To support its proper-cause requirement, New York relied on several English and early American firearms regulations that, in its view, demonstrated a general governmental power to regulate the public carrying of firearms. The Court, however, refused to treat those regulations as more than the sum of their parts. Although New York's cited regulations suggested the

constitutionality of certain narrow, "well-defined" public-carry restrictions, the Court concluded they did not permit "broadly prohibiting" public carry in whatever way a legislature finds appropriate. *Id.* at 2138. New York could not derive a general, far-reaching power to proscribe public carry simply by cobbling together a handful of discrete, targeted laws that regulated public carry in limited and specific ways.

 ***First,*** New York cited the 1328 Statute of Northampton, which "provided that, with some exceptions, Englishmen could not 'come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere.'" *Id.* at 2139 (quoting 2 Edw. 3 c. 3 (1328)). New York pointed as well to colonial and early-republic statutes prohibiting similar conduct. *Id.* at 2142-46. According to New York, these regulations demonstrated a "sweeping" governmental power to restrict public carry. *Id.* at 2139. But the Court read the regulations as prohibiting only "bearing arms in a way that spreads 'fear' or 'terror' among the people." *Id.* at 2145. And because those regulations prohibited only one particular manner of public carry, *id.* at 2143, they did not establish that the Second Amendment "permit[s] *broad* prohibitions on *all* forms of public carry," *id.* at 2145 (emphasis added).

 ***Second,*** New York cited several statutes from "the early to mid-19th century" that "proscribed the concealed carry of pistols and other small weapons" in public. *Id.* at 2146. New York argued these statutes demonstrated that states may "ban public carry altogether." *Id.* But again, the Court refused to endorse such a far-reaching reading of the historical record. State courts interpreting those statutes had held "concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry." *Id.* (emphasis in original). And the *Bruen*

29

Court declined to conclude, based on the permissibility of restricting one "particular mode" of public carry (concealed), that states may enact a "*general* prohibition" on *all* modes of public carry (both concealed and open). *Id.* at 2146-47 & n.19 (emphasis added).

**Third,** New York analogized its proper-cause requirement to mid-19th-century "surety statutes." *Id.* at 2148. Those statutes provided that if someone carried a firearm in public and thereby placed others in reasonable fear of injury, he would have to "post a bond before publicly carrying a firearm" again, unless he could show he had "reasonable cause to fear an assault or other injury." *Id.* The Court rejected the comparison. Under surety statutes, "everyone started out with robust carrying rights and only those reasonably accused were required to show a special need in order to avoid posting a bond." *Id.* at 2149. New York's regime, by contrast, "presume[d] that individuals have *no* public carry right without a showing of heightened need." *Id.* at 2148 (emphasis in original). From the fact that states may "provide financial incentives for responsible" public carry, the Court refused to conclude that other, historically unprecedented public-carry restrictions are permissible. *See id.* at 2150.

And the Court held that, even in the aggregate, these regulations did not add up to a historical tradition of "broadly prohibit[ing]" all forms and manners of public carry.  The Court's historical survey revealed a few "well-defined" restrictions on public carry: those that limited "the intent for which one could carry arms" (to terrorize the people), "the manner of carry" (concealed vs. open), and "the exceptional circumstances under which one could not carry arms" (if a surety statute applied). *Id.* at 2138. But that's all.  New York could not extrapolate, from these specifics, a general power to regulate public carry more broadly.

*Bruen* dooms any effort to carve out Second Amendment exceptions for all groups labeled "dangerous," "unvirtuous," or "disrespectful of the law." That effort relies on a handful

of founding-era statutes disarming specific groups (slaves, Native Americans, certain religious minorities, and disloyal subjects), from which the government gleans the much broader principle that "dangerous" or "unvirtuous" groups, in general, do not enjoy the right to keep and bear arms. This is exactly the maneuver the Court rejected in *Bruen*: identify a few specific examples of conduct that historically has been constitutionally unprotected (e.g., carrying firearms "to terrorize the people," carrying concealed in states where open carry is permitted), move up the level-of-generality ladder to a descriptor that unites these discrete examples (e.g., "public carry"), and then apply that umbrella term to *all* conduct that (arguably) falls in the broader category (e.g., publicly carrying without "proper cause"). *See Harrison*, 2023 WL 1771138, at *19 n.134 (holding government cannot use this "trick" to disarm "whole new classes of people" who "aren't remotely the sort of persons that were historically regulated"); *Range*, 69 F.4th at 105 ("That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today. And any such analogy would be 'far too broad.'" (quoting *Bruen*, 142 S. Ct. at 2134)); *cf. United States v. Power*, No. 20-PO-331-GLS, 2023 WL 131050, at *10 (D. Md. Jan. 9, 2023) ("As the Supreme Court cautioned, '[e]verything is similar in infinite ways to everything else.' So, the Court must avoid finding that analogies are 'relevantly similar' where the connection is overly superficial or general." (quoting *Bruen*, 142 S. Ct. at 2132)).

    In addition, the Second Amendment exceptions that this approach would produce are grossly overbroad. Categories like "dangerous" and "disrespectful of the law" are anything but "well-defined." *Bruen*, 142 S. Ct. at 2156. Those labels are so malleable that, in the wrong hands, they could be applied to virtually any group of people—and thereby "eviscerate" the

right to keep and bear arms. *Id.* at 2134; *see Medina v. Whitaker*, 913 F.3d 152, 159-60 (D.C. Cir. 2019) (concluding "'dangerousness' standard" is too "amorphous . . . to delineate the scope of the Second Amendment"); *Kanter v. Barr*, 919 F.3d 437, 465 (7th Cir. 2019) (Barrett, J., dissenting) ("The government could quickly swallow the [Second Amendment] right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun."). These terms not only lack a "*clear* limiting principle," they lack any limiting principle at all. *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (declining to carve out broad new category of speech unprotected by the First Amendment) (emphasis added); *see also Bruen*, 142 S. Ct. at 2130 (analogizing Second Amendment to First Amendment).

To defend § 922(g)(1), the government cannot rely on unbounded descriptors like "dangerous" and "disrespect for the law." Instead, it must descend into particulars.

## IV.    Conclusion

For the reasons described above, the Court should dismiss the indictment as violative of the Second Amendment, both facially and as applied to Mr. Brooks.

                                        /s/
                                  JOSEPH A. BALTER #04496
                                  Law Office of Joseph A. Balter, LLC
                                  Mt. Washington Mill
                                  1340 Smith Avenue, Ste 200
                                  Baltimore, Maryland 21201
                                  Telephone:  (410) 375-7082
                                  Facsimile:   (410) 779-1201
                                  Email: joseph@josephbalterlaw.com