IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA     *

     v.      *      **Criminal No. ELH-20-0034**

CHARVEZ BROOKS,     *

     Defendant.      *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT'S
MOTION TO DISMISS INDICTMENT FOR SPEEDY TRIAL VIOLATION
<u>AND MOTIONS TO SUPPRESS EVIDENCE AND STATEMENTS</u>**

Erek L. Barron
United States Attorney

Anatoly Smolkin
Ari D. Evans
Assistant United States Attorneys

36 South Charles Street, Fourth Floor
Baltimore, MD 21201
Tel.: (410) 209-4800
Fax: (410) 962-3124
<u>Anatoly.Smolkin@usdoj.gov</u>
<u>Ariel.Evans@usdoj.gov</u>

Dated:  January 26, 2024

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 2

    A.    Law Enforcement's Pursuit of the Defendant and Defendant Throwing a
           Firearm from his Car............................................................................. 2

    B.    Defendant's Arrest and Post-Miranda Statements. .............................. 6

    C.    Search Warrant for the Defendant's Blue Acura. ................................ 8

PROCEDURAL HISTORY ..................................................................................... 8

ARGUMENT ......................................................................................................... 18

    I.    The Court Should Deny the Defendant's Motion to Dismiss Indictment for Speedy
         Trial Violation Because the Defendant's Rights Have Not Been Violated Under Either
         the Speedy Trial Act or the Sixth Amendment. ................................................ 18

             A.  The Defendant's Rights Under the Speedy Trial Act Have Not
                 Been Violated............................................................................. 19

                 i.    Automatic exclusions under the Speedy Trial Act. ........................ 19

                 ii.    Ends-of-Justice exclusions under the Speedy Trial Act. ................ 23

                 iii.   Summary of excluded time under the Speedy Trial Act................. 29

             B.  The Defendant's Constitutional Speedy Trial Rights Were
                 Not Violated................................................................................ 30

    II.   The Court Should Deny the Defendant's Motion to Suppress Tangible
         and Derivative Evidence. ................................................................................ 33

              A.  The Defendant lacks Fourth Amendment standing to challenge the seizure of
                 the firearm because the Defendant did not have a reasonable expectation
                 of privacy in the public parking lot on Belair Road where the firearm was
                 recovered and because he abandoned the firearm........................... 33

             B.  The Defendant was not seized within the meaning of the Fourth Amendment
                 when he threw the firearm out of the window of the blue Acura because the
                 Defendant had not submitted to law enforcement's show of authority. ......... 36

C. Assuming the Defendant had been seized when he threw the firearm out of the window of the blue Acura, the seizure was justified because law enforcement had reasonable suspicion to conduct a traffic stop.................... 37

D. Because the seizure of the firearm did not implicate the Fourth Amendment and, in any event, was justified under the Fourth Amendment, each of the Defendant's arguments concerning the suppression of evidence fail............ 40

III. The Court Should Deny the Defendant's Motion to Suppress Statements Because They Were Given After a Valid Miranda Waiver and Were Voluntary........................ 41

A. Legal Standards................................................................................. 41

B. The Defendant was properly advised of his Miranda rights, which he knowingly and voluntarily waived when he chose to speak to law enforcement.................................................................................... 44

**CONCLUSION** ...................................................................................... 46

## INTRODUCTION

On August 10, 2019, the Defendant, Charvez Brooks, was in the 3400 block of Belair Road in Northeast Baltimore, driving a metallic blue, four-door Acura that was missing a front a license plate. Less than 48 hours earlier—and only 2.4 miles away—Baltimore Police Department Sgt. Isaac Carrington was shot in front of his home by then-unknown assailants. The suspect vehicle from the shooting was a metallic blue, four-door Acura that did not have a front license plate.

A patrol officer, aware of the description of the suspect vehicle from the shooting of Sgt. Carrington, saw that the Defendant's vehicle and decided to investigate further. After a short period of the officer following the Defendant's vehicle, the Defendant sped away. At that point, the officers activated their lights and sirens and tried to pull over the Defendant's vehicle. The Defendant did not stop. Instead, he thew a loaded handgun out of the window of his car, which landed in a public parking lot. Two people waiting at a bus stop saw the handgun get thrown from the Defendant's vehicle and flagged down a police officer.

The Defendant continued to try to flee from the police. After crossing into Baltimore County, the Defendant stopped his car and was finally taken into custody. After he was arrested, the Defendant gave a voluntary, post-<u>Miranda</u> interview.

The Defendant was charged was possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1). The Defendant has filed motions seeking to suppress: (i) tangible and derivative evidence seized on August 10, 2019 (ECF No. 53) and (ii) the Defendant's post-<u>Miranda</u> statements (ECF No. 52). These motions should be denied. First, the Defendant does not have Fourth Amendment standing to challenge the seizure of the firearm. He did not have a reasonable expectation of privacy in the parking lot where the firearm was recovered, and he abandoned the firearm. Second, the Defendant did not submit to law enforcement's show of authority when he attempted to flee from the police, so he was not seized within the meaning of the Fourth

1

Amendment.  Finally, even assuming the Defendant was seized when he threw the firearm, the seizure was justified because law enforcement had reasonable suspicion to conduct a traffic stop. Regarding the Defendant's statements to law enforcement, they were given after a valid <u>Miranda</u> waiver and were otherwise voluntary.

The Defendant was already pending charges in this District when he was charged in this case.  Throughout the pendency of this case, both parties consistently and repeatedly asked this Court to hold the case in abeyance to allow for other proceedings involving the Defendant to reach a conclusion.  As the parties told this Court several times, those other proceedings were impacting the plea discussions in this case.  Not only that, but the ability to schedule this case for trial was also greatly impacted by COVID-19.  Ultimately, the parties' plea discussions culminated in a signed plea agreement in September 2023.  But on October 6, 2023, when the Defendant appeared for a rearraignment, the Defendant declined to enter a guilty plea.

That was the first time the defense requested to schedule a trial in this case.  Up until that point, the Defendant was clear that he did not want a trial scheduled in this case.  But now, the Defendant claims that his speedy trial rights have been violated and has moved to dismiss the indictment.  For the reasons discussed below, the Court should deny the Defendant's motions.

## **FACTUAL BACKGROUND**[1]

A.   **Law Enforcement's Pursuit of the Defendant and Defendant Throwing a Firearm from his Car.**

On August 8, 2019, at approximately 3:26 p.m., multiple Baltimore Police Department ("BPD") officers in the Northeast District responded to a nonfatal shooting in the 5600 block of

---

[1]  Unless supported by a citation to an exhibit or to a document filed on CM/ECF, the information contained in this section is a summary of the witness testimony and other evidence that the government anticipates presenting at the motions hearing.

Summerfield Avenue.  The victim of the shooting was BPD Sgt. Isaac Carrington.  He had been shot near his house.  Sgt. Carrington survived the shooting, but he was left paralyzed.  See https://www.cbsnews.com/baltimore/news/baltimore-man-sentenced-to-for-shooting-paralyzing-baltimore-police-sgt-isaac-carrington/ (last visited January 25, 2024).  Officers Thomas Galligan and Calvin Kreiter were among the officers who responded to the shooting.

After the shooting, detectives circulated to other BPD officers photographs and a description of a suspect vehicle that investigators believed was involved in the shooting.  The suspect vehicle was a four-door, metallic blue Acura TL with an unknown license plate number. The photographs showed that the suspect vehicle was missing a front license plate.

Two days after the shooting, on August 10, 2019, Officers Galligan and Kreiter were on routine patrol in separate marked patrol vehicles in the Northeast District.  At around 11:49 a.m., Officer Galligan was parked in the 3400 block of Belair Road when he saw a newer model, metallic blue Acura without a front license plate and with tinted windows.  The blue Acura matched the description of the suspect vehicle involved in the shooting of Sgt. Carrington.[2]  The blue Acura was driving northbound on Belair Road, but because Officer Galligan's patrol car was facing southbound, he briefly activated his emergency lights to make a U-turn.  Once Office Galligan was going northbound on Belair Road, he turned off his lights.

Officer Galligan drove for several blocks and tried to position his patrol vehicle behind the blue Acura.  During this time, Office Galligan did not have his vehicle's emergency lights or sirens activated, and he had not attempted to initiate a traffic stop.  Instead, Officer Galligan requested

---

[2]  The 3400 block of Belair Road, where Officer Galligan saw the blue Acura, and the 5600 block of Summerfield Avenue, where Sgt. Carrington was shot, are both in the BPD Northeast District and are approximately 2.4 miles apart.  See Map of Travel from 3400 Belair Road to 5600 Summerfield Avenue, attached as **Exhibit 1**.

more units to the area and provided BPD dispatch with the license plate number for the blue Acura. Officer Kreiter was nearby and was also driving his patrol vehicle northbound on Belair Road to provide any needed assistance.

When Officer Galligan and the blue Acura were in the 4100 block of Belair Road, the blue Acura began to accelerate away from Officer Galligan.  After that, near the 4200 block of Belair Road, Officer Galligan activated his emergency lights and sirens and attempted to pull the blue Acura over.  The driver of the blue Acura—later identified as the Defendant Charvez Brooks— did not stop in response to Officer Galligan's lights and sirens.  As a result, Officer Galligan and Officer Kreiter pursued the Defendant and called for additional police assistance.  Rather than stopping his vehicle, the Defendant tried to flee from the police—driving recklessly, running numerous red lights, and almost crashing into multiple vehicles.

While Officers Galligan and Kreiter pursued the Defendant, two civilians who had been waiting at a bus stop near the intersection of Belair Road and Overlea Avenue flagged down another patrol officer, Officer Hayes.  The civilians informed Officer Hayes that a handgun had been thrown out of the passenger side window of the vehicle that the police were pursuing and that the handgun landed in a nearby parking lot.[3]  The civilians directed Officer Hayes to the handgun. Officer Hayes radioed to the officers who were still pursuing the Defendant that the Defendant had thrown a handgun out of the vehicle.  Other officers responded to the parking lot to assist Officer Hayes.  Officer Hayes and other officers remained near the firearm while the pursuit of the Defendant continued and until the firearm was ultimately recovered.

---

[3]  Body worn camera footage shows that the pursuit of the Defendant's vehicle took the Defendant and officers directly past the parking lot where the handgun was recovered, near the intersection of Belair Road and Overlea Avenue.

Meanwhile, Officer Galligan, Officer Kreiter, and other officers continued to pursue the Defendant northbound on Belair Road. Because the police pursuit was heading towards the Baltimore County line, Officer Kreiter requested assistance from the Baltimore County Police Department. Once the Defendant made it to Baltimore County, the Defendant turned left from Belair Road and made several additional turns into a residential area.

The Defendant eventually pulled the blue Acura over on Plantagenet Circle, near Seven Courts Drive, in Parkville, Maryland. The Defendant was the only occupant inside the vehicle. He complied with law enforcement officers' commands to exit the vehicle and was taken into custody. The blue Acura was later towed by BPD to the Crime Lab in anticipation of a search warrant being submitted.

The pursuit of the Defendant lasted more than 8 minutes and spanned approximately 7.4 miles—from the point at which Officer Galligan first attempted to pull the Defendant's car over to the point at which the Defendant finally stopped his car in Baltimore County. See Map of Travel from 4200 Belair Road to Plantagenet Circle, attached as **Exhibit 2**.[4]

Officer Galligan submitted charging documents in state court relating to the Defendant's possession of a firearm and ammunition. In addition, Officer Galligan issued the following traffic citations: (i) reckless driving; (ii) negligent driving; (iii) unsafe lane changing; (iv) failure to drive right of center; (v) failure to attach plates at front and rear; (vi) speed greater than reasonable; (vii) failure to obey traffic device; and (viii) failure to stop at a red light. See Traffic Citations Issued to Charvez Brooks on August 10, 2019, attached as **Exhibit 3**.

---

[4] According to Google Maps, this drive should normally take approximately 16 minutes without traffic. See **Exhibit 2**.

**B.      Defendant's Arrest and Post-<u>Miranda</u> Statements.**

After the Defendant was arrested, he was transported to the Homicide Unit at BPD Headquarters for an interview.  The interview was audio and video recorded and was conducted by Detective Shawn Reichenberg and Detective Ryan O'Connor.[5]

When the Defendant was first placed in an interview room, he was wearing handcuffs.  But before starting the interview, Detective Reichenberg entered the interview room and removed the Defendant's handcuffs.  Detective Reichenberg also offered the Defendant water.  The Defendant was wearing leg shackles, but he was not otherwise physically restrained to anything in the interview room.  The Defendant acknowledged to an officer that his leg shackles were not too tight.  When one of the officers returned to the interview room to provide the Defendant with a bottle of water, the Defendant asked if a police officer could come back to the interview room to speak with him.

Detectives Reichenberg and O'Connor entered the interview room at approximately 2:07 p.m. to begin the interview.  They were both wearing plain clothes and did not have any firearms or other weapons exposed.  In fact, the detectives did not have their firearms in the interview room at all; their firearms were secured in a different location.   Detective Reichenberg introduced himself and Detective O'Connor to the Defendant and told the Defendant that he could talk to them if he wanted to.  At that point, Detective Reichenberg began reviewing a written <u>Miranda</u> rights form with the Defendant.  <u>See</u> Signed <u>Miranda</u> Explanation and Waiver of Rights Form, attached as **Exhibit 4**.  Detective Reichenberg read the rights out loud and, after each right, asked

---

[5]  The government will play relevant portions of the interview during the motions hearing.

the Defendant if he understood.  The Defendant acknowledged that he understood each of his rights.

When Detective Reichenberg asked if the Defendant wanted to talk to them, the Defendant stated that he wanted to know why he was in the Homicide Unit.  Detective Reichenberg told the Defendant that he could stop the conversation at any time, but he indicated that for the conversation to continue and for the detectives to answer the Defendant's question about why he was there, the Defendant needed to indicate that he wanted to speak with them.  The Defendant agreed, and he signed the written <u>Miranda</u> waiver form.  <u>Id.</u>

The interview lasted approximately 26 minutes.  Detective Reichenberg began by asking the Defendant general questions about his background, his employment, and the blue Acura the Defendant was driving when he was arrested.  Detective Reichenberg then explained that they were investigating the nonfatal shooting of a police officer from a few days earlier.  The Defendant told the detectives that he was not involved in the shooting incident and offered to provide the detectives with paystubs and other employment information showing that he was at work during the time of the shooting.[6]  The Defendant also made several statements acknowledging that he possessed the firearm at issue in this case.

At no point during the interview did the Defendant ask to end the interview, nor did he ever say he wanted to stop talking to the detectives or to speak to an attorney.  Throughout the interview, the detectives were calm and cordial with the Defendant.  In fact, there were times during the interview that the Defendant and the detectives joked with one another.

---

[6]  The Defendant was cleared as a suspect in connection with the shooting of Sgt. Carrington.

The interview ended at approximately 2:33 p.m.  The Defendant shook hands with the detectives, and they left the interview room.  The Defendant subsequently left the interview room for a few minutes to go to the bathroom.  At around 4:12 p.m., officers came back to the interview room to return certain non-evidentiary property to the Defendant.

### C.  Search Warrant for the Defendant's Blue Acura.

The Defendant's blue Acura was towed by BPD to the Crime Lab on August 10, 2019, after the Defendant was arrested.  On August 12, 2019, the Honorable Catherine O'Malley of the District Court of Maryland for Baltimore City signed a search warrant authorizing the search of the vehicle.  See Exhibit 1 to Defendant's Motion to Suppress Evidence, ECF No. 55 (filed under seal).  In support of the search warrant, Officer Galligan's affidavit described the events of August 10, 2019, which are described above.

The search warrant was executed on August 12, 2019, at around 10:30 a.m.  Inside the vehicle, officers located three cell phones, various paperwork, and a yellow plastic container with a small amount of suspected marijuana.  Investigators also lifted latent fingerprints and swabbed portions of the vehicle for possible DNA.  In addition, law enforcement took photographs of the vehicle before and during the search.[7]

### PROCEDURAL HISTORY

On January 20, 2020, the Grand Jury for the District of Maryland returned an Indictment charging the Defendant with possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1).  ECF No. 1.  At that time, the Defendant had already been charged, in a separate

---

[7] The government does not intend to introduce evidence at trial of the suspected marijuana that was located inside the blue Acura.

criminal case pending in this Court, with conspiracy to commit Hobbs Act robbery and substantive Hobbs Act robbery (the "Hobbs Act Case").  <u>See</u> Criminal No. JKB-18-0408.  Because the Defendant claims that his Speedy Trial rights have been violated with respect to the instant case, it is necessary to provide a detailed summary of the proceedings in the Hobbs Act Case and other matters, as they directly impacted scheduling a trial in this case.

The Hobbs Act Case was scheduled for a jury trial to commence on January 13, 2020.  <u>See</u> Criminal No. JKB-18-0408, ECF No. 50.  A few days before trial was scheduled to start, on January 9, 2020, the parties notified the Court that the Defendant had signed a plea agreement and that a trial was no longer necessary.  As a result, a rearraignment in the Hobbs Act Case was scheduled for January 10, 2020.  <u>Id.</u> at ECF No. 63.  Although the Defendant had signed a plea agreement, the Defendant declined to enter a guilty plea when he appeared before this Court on January 10, 2020.  <u>Id.</u> at ECF No. 67 ("Status Hearing, Rearraignment NOT HELD as to Charvez Brooks").  Instead, the Defendant discharged his then-attorney, Ryan Burke, and he requested the appointment of new counsel.  On January 13, 2020, Joseph Murtha was appointed to represent the Defendant.  <u>Id.</u> at ECF No. 73.  During a status conference held on January 15, 2020, the Court set a new schedule for motions and trial.  <u>Id.</u> at ECF No. 74.  Under the new schedule, trial in the Hobbs Act Case was scheduled to begin on May 18, 2020.  <u>Id.</u>

As the parties navigated the new trial schedule in the Hobbs Act Case, the Defendant had his initial appearance and arraignment in this case on March 6, 2020.  ECF Nos. 8, 9.  Like in the Hobbs Act Case, Joseph Murtha was appointed to represent the Defendant in this case.  ECF No. 7.  On March 9, 2020, the Court entered a scheduling order, which provided for the filing of defense motions by March 27, 2020, and scheduled a telephone conference for April 1, 2020.  ECF No. 11.

On March 13, 2020, the Defendant filed a request for a detention hearing in both this case and in the Hobbs Act Case.  See ECF No. 12; Criminal No. JKB-18-0408, ECF No 83.  After a detention hearing on March 27, 2020, Judge Copperthite ordered that the Defendant remain detained pending trial.  See ECF Nos. 13, 14; Criminal No. JKB-18-0408, ECF Nos. 84, 85.

In the meantime, the COVID-19 pandemic had started to have a devastating impact on the United States and the world.  As a result, Chief Judge Bredar issued Standing Orders to address the Court's operations under the exigent circumstances created by COVID-19.  Pursuant to Second Amended Standing Order 2020-03, all nonessential court proceedings were cancelled through April 24, 2020.  See In re Standing Orders, Misc. No. 00-308, ECF No. 93.[8]  As a result, this Court cancelled the telephone conference that had been scheduled for April 1, 2020 in this case.  ECF No. 13.

On April 6, 2020, this Court asked the parties to submit a status report in this case by April 21, 2020.  ECF No. 16.  After conferring with defense counsel, the government submitted a status report.  ECF No. 17.  The status report explained that due to the COVID-19 pandemic, the trial in the Hobbs Act Case would need to be rescheduled.  Id.  The report also explained that "the parties respectfully request that the [Hobbs Act] robbery case, ELH-18-0408, proceed to trial *before the instant case is scheduled*."  Id. (emphasis added).  The parties requested that "when normal Court operations resume, a telephone conference be held in order to reschedule the trial date in ELH-18-0408 and that a status report on this case be provided at that time."  Id.

---

[8]   Chief Judge Bredar entered numerous additional Standing Orders to address the Court's operations under the exigent circumstances created by COVID-19.  Several of those Standing Orders are described below.

On April 24, 2020, the Court held a telephone status conference in both this case and in the Hobbs Act Case.  <u>See</u> Paperless Docket Entry between ECF Nos. 17 and 18; Criminal No. JKB-18-0408, Paperless Docket Entry between ECF Nos. 85 and 86.  After the telephone conference, the Court issued a revised Scheduling Order in the Hobbs Act Case.  <u>See</u> Criminal No. JKB-18-0408, ECF No. 86.  The Scheduling Order explained that "[i]n light of the pandemic, it was necessary to reschedule the trial."  <u>Id.</u>  The trial was rescheduled to July 20, 2020.  <u>Id.</u>

On May 22, 2020, this Court held another telephone status conference in the Hobbs Act Case.  Due to the ongoing COVID-19 pandemic, trial had to be rescheduled again.  <u>See</u> Criminal No. JKB-18-0408, ECF No. 89.  The Court issued a revised Scheduling Order, which rescheduled the trial to August 24, 2020.  <u>Id.</u>  On July 6, 2020, the Hobbs Act Case was reassigned to Chief Judge Bredar.  <u>See id.</u> at ECF No. 99.  Chief Judge Bredar issued a superseding Scheduling Order, which maintained a trial date of August 24, 2020.  <u>Id.</u>

The Hobbs Act Case proceeded to trial on August 24, 2020.  It was the first federal trial held in the District of Maryland since court proceedings and trials were cancelled due to COVID-19.  After a five-day trial, the jury found the Defendant guilty of conspiracy to commit Hobbs Act robbery and not guilty of substantive Hobbs Act robbery.  <u>Id.</u> at ECF No. 136.

Before sentencing in the Hobbs Act Case, on March 10, 2021, Chief Judge Bredar referred this case to then-Magistrate Judge Deborah L. Boardman for an attorney inquiry hearing.  <u>Id.</u> at ECF No. 158.  On March 16, 2021, after conducting an attorney inquiry hearing, Judge Boardman relieved Joseph Murtha of his appointment to represent the Defendant *in both* the Hobbs Act Case and in this case.  ECF No. 22; Criminal No. JKB-18-0408, ECF No. 162.  Current counsel, Joseph Balter, was then appointed to represent the Defendant in both cases.  ECF No. 24; Criminal No. JKB-18-0408, ECF No. 163.

Sentencing in the Hobbs Act Case occurred on October 15, 2021, with Mr. Balter representing the Defendant. Chief Judge Bredar sentenced the Defendant to 124 months of imprisonment. See Criminal No. JKB-18-0408 at ECF No. 186. The Defendant filed a timely notice of appeal on October 22, 2021. Id. at ECF No. 189.

During all phases of the Hobbs Act Case, the Court was attempting to manage the impact that COVID-19 had on the Court's ability to safely continue conducting hearings and trials. Specifically, in March, April, and May of 2020, Chief Judge Bredar entered Standing Orders suspending in-court proceedings—including criminal jury trials—and providing that the time period between March 16, 2020 and July 31, 2020 was excluded under the Speedy Trial Act. See In re Standing Orders, Misc. No. 00-308, ECF Nos. 93, 99, 103. As noted above, the Hobbs Act Case was able to proceed to trial in August 2020. But then, in November 2020 and January 2021, Chief Judge Bredar entered additional Standing Orders that suspended in-court proceedings between November 16, 2020 and February 26, 2021. Id. at ECF Nos. 119, 120, 123. On February 17, 2021, Chief Judge Bredar entered Standing Order 2021-04, which provided that "[o]n or after March 15, 2021, the Court will resume conducting *some jury trials*." Id. at ECF No. 127 (emphasis added). Later that year, in December 2021, after a new surge of COVID-19 cases, Chief Judge Bredar entered Standing Orders that postponed jury selections and trials between December 27, 2021 and February 14, 2022. Id. at ECF Nos. 142, 145. It was not until January 3, 2023 that the Court "return[ed] to full and (nearly) unrestricted operations." Id. at ECF No. 149.

Meanwhile, the appeal from the Hobbs Act Case remained pending for more than a year. On January 3, 2023, the Fourth Circuit affirmed the Defendant's conviction and sentence. Id. at ECF No. 224. On January 9, 2023, the Defendant filed a petition for a writ of certiorari to the

Supreme Court of the United States.  ECF No. 225.  The Supreme Court denied the Defendant's petition on February 21, 2023.  ECF No. 227.

While the Hobbs Act Case was making its way through trial and was pending appeal, the parties consistently and repeatedly notified the Court of their *joint request* for the Hobbs Act Case to reach a conclusion *before* the Court entered a scheduling order in the current case.  To that end, this Court granted four Consent Motions to Exclude Time Pursuant to the Speedy Trial Act.  The motions were based on, among other things, the parties' desire to hold the Hobbs Act Case in abeyance before a schedule was entered in this case, as well as the disruption to courthouse operations due to COVID-19.  The first and second motions were filed with the consent of the Defendant's prior counsel, Joseph Murtha.  The third and fourth motions with filed with the consent of the Defendant's current counsel, Joseph Balter.  The following is a summary of the Consent Motions:

| Date of Motion | Reasons for Speedy Trial Exclusion | Order Approving Exclusion | Time Period Excluded |
|---|---|---|---|
| August 3, 2020 (ECF No. 18) | ▪ The Court's approval of the parties' request, on April 21, 2020, that this case should remain unscheduled until the Hobbs Act Case was resolved.  ECF No. 18 ¶ 3.<br>▪ COVID-19 Standing Orders suspending criminal jury trials and excluding the time between March 16, 2020 and July 31, 2020 from the Speedy Trial calculation.  Id. ¶ 2. | August 3, 2020 (ECF No. 19) | March 16, 2020 – January 2, 2021 |
| February 2, 2021 (ECF No. 20) | ▪ The Court's approval of the parties' request, on April 21, 2020, that this case should remain unscheduled until the Hobbs Act Case was resolved.  ECF No. 20 ¶ 2.<br>▪ Additional COVID-19 Standing Orders, which further suspended criminal jury trials between November 16, 2020 and February 26, 2021.  Id. ¶ 3. | February 2, 2021 (ECF No. 21) | January 3, 2021 – April 23, 2021 |
| June 14, 2021 (ECF No. 25) | ▪ The Court's approval of the parties' request, on April 21, 2020, that this case should remain unscheduled until the Hobbs Act Case was resolved.  ECF No. 25 ¶ 2. | June 14, 2021 (ECF No. 26) | April 23, 2021 – October 15, 2021 |

| | | | |
|---|---|---|---|
| | ▪ Additional COVID-19 Standing Orders, which further suspended criminal jury trials between November 16, 2020 and February 26, 2021. <u>Id.</u> ¶ 3.<br><br>▪ The upcoming sentencing hearing in the Hobbs Act Case, which was scheduled for October 15, 2021. <u>Id.</u> ¶ 8. | | |
| January 6, 2022 (ECF No. 27) | ▪ The Court's approval of the parties' request, on April 21, 2020, that this case should remain unscheduled until the Hobbs Act Case was resolved.  ECF No. 27 ¶ 2.<br><br>▪ Additional COVID-19 Standing Orders, which further suspended criminal jury trials between November 16, 2020 and February 26, 2021, and then again between December 27, 2021 and February 14, 2022.  <u>Id.</u> ¶ 3.<br><br>▪ The Defendant's pending appeal from the Hobbs Act Case and the parties' discussions concerning possible resolutions of the current case.  <u>Id.</u> ¶ | January 6, 2022 (ECF No. 28) | October 15, 2021 – January 31, 2022 |

In addition to the motions to exclude time under the Speedy Trial Act, the parties filed multiple joint status reports, notifying this Court that both the government and the Defendant wanted the Hobbs Act Case to be finally resolved—including the appeal—before a trial schedule was entered in this case.  Specifically, the parties asked for more time to allow for the appeal to conclude because the parties believed that the decision on appeal could impact the parties' ongoing plea discussions in this case.  For example, on January 11, 2022, the Defendant's counsel e-mailed counsel for the government to confirm that, during a phone conversation they had about the case, they "discussed holding the pending firearms case in abeyance pending the disposition of the appeal of the Hobbs Act conspiracy appeal" and that the parties "will return [to] the negotiations on this matter later in the month."  <u>See</u> January 11, 2022, E-mail from Joseph Balter to Anatoly Smolkin, attached as **Exhibit 5**.  Not only that, but the parties also notified the Court that the Defendant was seeking post-conviction relief from a conviction in the Circuit Court for Howard

County and that the post-conviction litigation was also impacting the parties' plea discussions.

The following is a summary of each joint status report filed in this case:[9]

| Date of Status Report | Summary of Status Update | Marginal Order Approving Status |
|---|---|---|
| April 21, 2020 (ECF No. 17) | ▪ Explaining that due to the COVID-19 pandemic, the trial in the Hobbs Act Case would need to be rescheduled.<br>▪ Explaining that the parties requested for the Hobbs Act Case proceed to trial before the instant case is scheduled. | N/A – Telephone Status Conference on April 24, 2020 |
| August 1, 2022 (ECF No. 32) | ▪ Reiterating the parties' previous request that the Hobbs Act Case proceed to trial before entering a scheduling order in this case.<br>▪ Explaining that the Fourth Circuit appeal from the Hobbs Act Case was fully-briefed on May 26, 2022 and was pending a decision.<br>▪ Requesting at least 60 more days before entering a scheduling order in this case because the outcome of the appeal from the Hobbs Act Case might impact ongoing plea discussions. | August 4, 2022 (ECF No. 33) |
| October 3, 2022 (ECF No. 34) | ▪ Reiterating the summary from the August 1, 2022 joint status report, which requested to hold this case in abeyance pending the Fourth Circuit ruling in the Hobbs Act Case.<br>▪ Requesting at least 30 more days before entering a scheduling order in this case because the outcome of the appeal from the Hobbs Act Case might impact ongoing plea discussions. | October 4, 2022 (ECF No. 35) |
| November 3, 2022 (ECF No. 36) | ▪ Reiterating the summary from the August 1, 2022 and October 3, 2022 joint status reports, which requested to hold this case in abeyance pending the Fourth Circuit ruling in the Hobbs Act Case.<br>▪ Requesting at least 30 more days before entering a scheduling order in this case. | November 4, 2022 (ECF No. 37) |
| July 24, 2023 (ECF No. 39) | ▪ Explaining that the Fourth Circuit had affirmed the Defendant's conviction and sentence on January 3, 2023 and that the Supreme Court denied the Defendant's petition for a writ of certiorari on February 21, 2023.<br>▪ Explaining that, in addition to the appeal in the Hobbs Act Case, the Defendant had been seeking post-conviction relief from a conviction in the Circuit Court for Howard County and noting that the Defendant had a hearing in March 2023 on his post-conviction motion and that the motion was denied on June 7, 2023.<br>▪ Requesting at least 45 more days before entering a scheduling order in this case because the appeal in the Hobbs Act Case and the | July 24, 2023 (ECF No. 40) |

---

[9] For the Court's convenience, all joint status reports—along with the marginal order approving each report—have been compiled and submitted together as **Exhibit 6**.

| | Defendant's post-convictions proceedings in Howard County had been impacting the parties' plea discussions in this case.<br><br>▪ Explaining that because those other proceedings have concluded, the parties were reengaged in plea discussions. | |
|---|---|---|
| September 7, 2023<br>(ECF No. 41) | ▪ Informing the Court that the parties have been engaged in productive plea discussions since the filing of the July 24, 2023 joint status report and that the government was in the process of finalizing a proposed plea agreement.<br><br>▪ Explaining that the parties anticipated reaching an agreement to resolve this case without the need for a trial. | September 8, 2023<br>(ECF No. 42) |

On September 21, 2023, the parties notified the Court that they had entered into a plea agreement in this case. The Court scheduled a rearraignment and sentencing for October 6, 2023. ECF No. 43. The Defendant appeared for the hearing as scheduled. But even though he had signed a plea agreement, the Defendant declined to enter a guilty plea on October 6, 2023. See ECF No. 48 ("Re-arraignment NOT HELD as to Charvez Brooks"); see also Transcript from October 6, 2023 Hearing, attached as **Exhibit 7**, at 2-3. After consulting with the Defendant, Mr. Balter confirmed that the Defendant "does not wish to plead guilty today." **Exhibit 7** at 3.

Because the Defendant did not intend to enter a guilty plea, the Court was prepared to schedule a trial as soon as possible. Id. at 3-4. The Court explained the reasons that a trial had not yet occurred in this case:

> THE COURT: And I just want to note that it's a 2020 case, so I'm going to want to get it tried as quickly as possible. *But the record should reflect the delay was, as I've understood it, at the request of both sides because there was an appeal in the case that Judge Bredar tried, an unrelated case, and that was a matter that I know we were going to be discussing if we got that far, but JKB-18-0408.*
>
> And it actually was originally my case. I was going to mention this because I'm not unfamiliar with that case. I handled the case and there were three defendants, and it went to trial in August of 2020.
>
> And the reason, just in case anyone's wondering that it was ultimately tried by Judge Bredar, is we were, as you may recall, still in the throws (sic) of COVID-19 and the court was attempting to resume the jury trial process. And this was a case

16

that Judge Bredar, as the chief judge, he thought he was – he should try a case, and selected this one so we could try to wrinkle – iron out the wrinkles, if you will, in managing how we try a case during COVID.  And so this is the only defendant in that case who went to trial, and that's why Judge Bredar tried the case.

And it's a longwinded way of saying that resulted in an appeal, and the appeal was affirmed recently, relatively recently, and *this case, the one – the one before me, the other Mr. Brooks case, 20-0034, has been held in abeyance because that's how you all wanted it to be handled*.  Because, obviously, if the appeal was affirmed – if the conviction was affirmed it might have an impact on how you handled this case.  So I hope I've explained, for the record, the delay.

Id. at 3-5 (emphases added).

Counsel for the government had the following additional exchange with the Court regarding the schedule in this case:

MR. SMOLKIN:  And, Your Honor, all of that is absolutely accurate.  And if I may just add briefly.  Not only did the Fourth Circuit affirm the conviction, but the defendant also petitioned to the Supreme Court for a writ of certiorari which was denied, and the defendant had a violation of probation matter in Howard County that he was litigating, which included post-conviction efforts to vacate that conviction.  So all of these other proceedings involving the defendant were ongoing, and for that reason we did hold this case in abeyance.

THE COURT:  Right.

MR. SMOLKIN:  We also have been engaged in quite substantive plea discussions for a while to try to get this case resolved, but I just wanted to add that.

Id. at 5.

The Court invited the defense to add any additional information concerning the delay in setting a trial in this case.  See id. ("THE COURT:  And I'll invite Mr. Balter to add anything he wants as well, but I did want to have an explanation on the record for why it has taken this long to get the case to trial.").  Neither the Defendant's counsel nor the Defendant provided any additional information, nor did they dispute the explanations for the delay in setting a trial.

The Court indicated it would "do [its] best to give you a [trial] date as quickly as we can get one." Id. at 6.  But defense counsel stated that before proceeding to trial, he wanted time to

file and litigate pretrial motions concerning Fourth Amendment issues and the Defendant's post-arrest statements to law enforcement:

> MR. BALTER:  I believe there are – motions have not been filed yet.  There are Fourth Amendment and statement issues that I would be filing motions on, so that we would need a date for working back from there; hopefully have a motion's hearing in advance of trial and obviously the time for the filing of motions as well.

> THE COURT:  Okay.  I will just say I had assumed there weren't any because there weren't any ever filed, and I just didn't realize there were any that were coming. Okay.  So then that changes the complexion a little bit.

Id. at 6.  The Court asked counsel to contact Chambers that afternoon to select a schedule for a motions hearing and a trial.  Id. at 8.

On October 6, 2023—after counsel contacted Chambers as instructed and selected a mutually agreeable schedule—the Court issued a Scheduling Order, which set the motions hearing for February 22, 2024, and scheduled a 5-day jury trial to commence on April 15, 2024.  ECF No. 49.  The Scheduling Order also set a deadline of December 8, 2023 for the filing of defense motions.  Id.

On December 8, 2023, the Defendant filed four pretrial motions.  ECF Nos. 50, 51, 52, 53. Among other things, the Defendant seeks dismissal of the indictment, arguing that his Speedy Trial rights have been violated.  This motion is meritless and should be denied.

### **ARGUMENT**

I.   **The Court Should Deny the Defendant's Motion to Dismiss Indictment for Speedy Trial Violation Because the Defendant's Rights Have Not Been Violated Under Either the Speedy Trial Act or the Sixth Amendment.**

There is no doubt that the delay in setting a trial schedule was at the joint request of both the government and the Defendant.  But even though the Defendant asked for the delay, he now claims that his speedy trial rights have been violated.  The Defendant is wrong.  As explained below, based on a combination of automatic exclusions and ends-of-justice exclusions, every day

that this case has been pending is properly excluded under the Speedy Trial Act.  The Defendant's constitutional speedy trial rights have not been violated either.  After balancing the relevant factors, it is clear that the pretrial delay was constitutionally permissible.  The Court should deny the Defendant's motion.

### A.  The Defendant's Rights Under the Speedy Trial Act Have Not Been Violated.

Under the Speedy Trial Act, a criminal defendant must be brought to trial within seventy days of the defendant's indictment or initial appearance, whichever is later.  18 U.S.C. § 3161(c)(1).  The Act provides for various circumstances under which time is excluded from this calculation.  See 18 U.S.C. § 3161(h).  Certain delays "are automatically excludable, *i.e.*, they may be excluded without district court findings."  Bloate v. United States, 559 U.S. 196, 203 (2010).  There is also a discretionary category of excludable time, known as the "ends-of-justice" exclusion under § 3161(h)(7).

### i.  Automatic exclusions under the Speedy Trial Act.

The automatic exclusions are described in 18 U.S.C. § 3161(h), subsections (h)(1) through (h)(6).  They include, among other things, "[a]ny period of delay resulting from other proceedings concerning the defendant, including but not limited to" periods of delay resulting from eight enumerated examples.  18 U.S.C. § 3161(h)(1)(A)-(H); see also United States v. Frey, 735 F.3d 350, 352 (9th Cir. 1984) ("The Act contains an extensive list of automatic exclusions for certain narrowly defined delays resulting from necessary pretrial proceedings, interlocutory appeals, and other similar causes.").  Those enumerated examples include "delay resulting from trial with respect to other charges against the defendant," "delay resulting from any pretrial motion," and "delay resulting from consideration by the court of a proposed plea agreement to be entered into by the defendant and the attorney for the Government."  18 U.S.C. §§ 3161(h)(1)(B), (D), (G).

Although that section lists examples of excludable proceedings, the list is not exhaustive.  See id. § 3161(h)(1) (excluding from computation "[a]ny period of delay resulting from other proceedings concerning the defendant, *including but not limited to* …") (emphasis added).

Here, the Defendant's trial and appeals in the Hobbs Act Case, the Defendant's post-conviction efforts in the Circuit Court for Howard County, the Defendant's pretrials motions in this case, and the time this Court considered the parties' plea agreement all constituted "other proceedings" involving the Defendant and are automatically excluded from the Speedy Trial Act calculation.

The Defendant had his initial appearance in this case on March 6, 2020.  Seven days later, on March 13, 2020, the Defendant filed a request for a detention hearing.  See ECF No. 12.  On March 27, 2020, Judge Copperthite ordered that the Defendant remain detained pending trial.  See ECF Nos. 13, 14.  The period from March 13, 2020 through March 27, 2020 is automatically excluded from the Speedy Trial Act because it was a "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion."  18 U.S.C. § 3161(h)(1)(D).

Moreover, the Defendant was already pending trial in the Hobbs Act Case when he was charged in this case on January 20, 2020, and when he first appeared on these charges on March 6, 2020.  Beginning on April 21, 2020, when the parties first filed a joint status report in this case (ECF No. 17), the parties asked this Court to hold this case in abeyance until the Hobbs Act Case reached a conclusion before setting a schedule in this case.  The Defendant was found guilty of Hobbs Act conspiracy on August 28, 2020, the district court sentenced the Defendant on October 15, 2021, the Fourth Circuit affirmed the Defendant's conviction and sentence on January 3, 2023, and the Supreme Court denied the Defendant's petition for a writ of certiorari on February 21,

2023.  See Criminal No. JKB-18-0408 at ECF Nos. 136, 186, 224, 227.  The trial and the appeals all constituted a "period of delay resulting from other proceedings concerning the defendant" under the general provision of 18 U.S.C. § 3161(h)(1).  And the time during which the Defendant was pending trial and sentencing in the Hobbs Act Case constituted a "delay resulting from trial with respect to other charges against the defendant" under one of the more specific, non-exhaustive examples of automatically excluded time under the Speedy Trial Act.  See id. § 3161(h)(1)(B). Accordingly, the time between January 20, 2020 through February 21, 2023 is automatically excluded from the Speedy Trial Act.

In addition to the Hobbs Act Case, the Defendant was engaged in post-conviction proceedings related to a prior conviction in the Circuit Court for Howard County.  See Docket Sheet, Howard County Circuit Court, Case No. 13-K-12-052364, attached as **Exhibit 8**.  As the parties reported to the Court in their July 24, 2023 status report, the post-conviction proceedings had been impacting the parties' plea discussions in this case.  See July 24, 2023 Status Report, included in **Exhibit 6**.  The Defendant's petition for post-conviction relief was filed on August 12, 2022 and a hearing was held on March 16, 2023.  See **Exhibit 8**.  The motion was denied on June 7, 2023.  Id.  On July 5, 2023, the Defendant filed an Application for Leave to Appeal with the Appellate Court of Maryland.  Id.; see also Docket Sheet, Appellate Court of Maryland, Case No. ACM-ALA-0920-2023, attached as **Exhibit 9**.  The Application for Leave to Appeal was denied on October 4, 2023.  See **Exhibit 9**.  The Defendant's post-conviction litigation constituted a "period of delay resulting from other proceedings concerning the defendant" under 18 U.S.C. § 3161(h)(1), especially because, as the parties explained to the Court, it was impacting the potential resolution of this case.  Accordingly, the time between August 12, 2022 through October 4, 2023 is automatically excluded from the Speedy Trial Act.

After the Hobbs Act Case was finally resolved, the parties continued engaging in plea discussions, which had been ongoing while the Hobbs Act Case was on appeal.  <u>See</u> August 1, 2022 Status Report, October 3, 2022 Status Report, November 3, 2022 Status Report, and July 24, 2023 Status Report, included in **Exhibit 6**.  Specifically, the parties reported to the Court in their July 24, 2023 status report that because the Hobbs Act Case and the Howard County post-conviction litigation had concluded, the parties were reengaged in plea discussions.  <u>Id.</u> at July 24, 2023 Status Report.  In a subsequent joint status report on September 7, 2023, the parties reported that the government was "finalizing a proposed plea agreement," and that the parties "anticipate that they will be able to reach an agreement to resolve this case without the need for a trial."  <u>Id.</u> at September 7, 2023 Status Report.  Then, on September 21, 2023, the parties reported to the Court that they had reached a plea agreement, which they submitted to the Court by e-mail for consideration.  The Court scheduled a rearrangement and sentencing for October 6, 2023.  ECF No. 43.  But on October 6, 2023, the Defendant declined to enter a guilty plea.  ECF No. 48.

Although delays resulting from plea negotiations are not *automatically* excluded under the Speedy Trial Act, <u>see</u> <u>United States v. Hart</u>, No 20-4534, slip op. at 6-8 (Jan. 25, 2024), available at <u>https://www.ca4.uscourts.gov/opinions/204534.P.pdf</u>, these delays are excluded under the ends-of-justice exclusion, which is discussed below.[10]   Nevertheless, the "delay resulting from consideration by the court of a proposed plea agreement" is automatically excluded.  18 U.S.C. 3161(h)(1)(G).  Here, the timeframe between September 21, 2023 (the date when the parties

---

[10] Until the Fourth Circuit's opinion in <u>United States v. Hart</u>, which was published on January 25, 2024, the Fourth Circuit had previously held that delays resulting from plea negotiations were automatically excluded under the Speedy Trial Act.  <u>See</u> <u>Hart</u>, No 20-4534, slip op. at 6-7 (citing <u>United States v. Leftenant</u>, 341 F.3d 338, 344-45 (4th Cir. 2003) and <u>United States v. Keita</u>, 742 F.3d 184, 188 (4th Cir. 2014)).

submitted the plea agreement to the Court for consideration) and October 6, 2023 (the date of the scheduled rearraignment hearing) is automatically excluded under this provision.

On October 6, 2023, after the Defendant declined to enter a guilty plea, counsel for the Defendant requested additional time to prepare and file pretrial motions in this case. See **Exhibit 7** at 6. The Court issued a Scheduling Order later that day, which set the motions hearing for February 22, 2024 and scheduled a 5-day jury trial to commence on April 15, 2024. ECF No. 49. The Scheduling Order also set a deadline of December 8, 2023 for the filing of defense motions. Id. The Defendant filed four pretrial motions on December 8, 2023, which are pending. ECF Nos. 50, 51, 52, 53. The delay resulting from these pretrial motions is automatically excluded under 18 U.S.C. § 3161(h)(1)(D). And as explained below, the time that the defense requested to prepare and file pretrial motions, and the time needed to prepare for trial in this case, is excluded under the ends-of-justice exclusion.

### ii. Ends-of-Justice exclusions under the Speedy Trial Act.

In addition to the time that was automatically excluded under the Speedy Trial Act, the ends-of-justice exclusion also operated to exclude large periods of time from the calculation under the Speedy Trial Act. Under the ends-of-justice exclusion, courts shall exclude "[a]ny period of delay resulting from a continuance …, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7); Zedner v. United States, 547 U.S. 489, 498-99 (2006) (discussing ends-of-justice continuances). Unlike an automatic exclusion, which requires no further action or findings by the court, the ends-of-justice exclusion requires a district court to "set[] forth, in the record of the case, either orally or in writing, its reasons for finding" that a continuance is warranted. 18 U.S.C. § 3161(h)(7)(A). The provision

provides substantive guidance by setting forth "[t]he factors, among others, which a judge shall consider in determining whether to grant [an ends of justice] continuance."   Id. § 3161(h)(7)(B). Those factors include whether the case is complex or unusual, whether counsel need additional time to prepare effectively, and whether the failure to grant a continuance would result in a miscarriage of justice.   Id.

"While the Speedy Trial Act is clear that the district court must 'se[t] forth, in the record of the case, either orally or in writing, its reasons' for finding that the ends of justice outweigh the need for a speedy trial, 'the Act is ambiguous on precisely when those findings must be' put on the record."   United States v. Pair, 84 F.4th 577, 584 (4th Cir. 2023) (quoting Zedner, 547 U.S. at 506-07).   But as the Fourth Circuit has recognized, a district court "is only required to state its findings on the record by the time it rules on the defendant's motion to dismiss; however, it must be clear from the record that the court conducted the mandatory balancing contemporaneously with the granting of the continuance."   United States v. Henry, 538 F.3d 300, 304 (4th Cir. 2008) (internal quotations omitted).   Indeed, in United States v. Smart, --- F.4th ----, 2024 WL 220378, at *4 (4th Cir. 2024), the Fourth Circuit recently confirmed that "the district court need not set forth its reasoning at the time of the continuance, but may place it on the record later, so long as the court does so before ruling on a motion to dismiss under the Speedy Trial Act."

Here, the Court properly conducted the contemporaneous ends-of-justice balancing when continuing the trial in this case in light of the COVID-19 pandemic, the parties' numerous joint requests for the Hobbs Act Case to reach a conclusion, and the parties ongoing plea discussions in this case.   Before COVID-19 substantially limited the ability to safely conduct court proceedings, on March 9, 2020, the Court entered a scheduling order, which provided for the filing of defense motions by March 27, 2020, and scheduled a telephone conference for April 1, 2020.   ECF No.

11. But on March 24, 2020, as a result of COVID-19, this Court cancelled the telephone conference that had been scheduled for April 1, 2020. ECF No. 13. On April 6, 2020, this Court asked the parties to submit a status report in this case by April 21, 2020. ECF No. 16. The parties' status report explained that due to the COVID-19 pandemic, the trial in the Hobbs Act Case would need to be rescheduled and that "the parties respectfully request that the [Hobbs Act] robbery case, ELH-18-0408, proceed to trial *before the instant case is scheduled*." Id. (emphasis added). During a conference call on April 24, 2020, this Court approved of the parties' request.

Meanwhile, Chief Judge Bredar began entering Standing Orders to manage the impact that COVID-19 had on the Court's ability to safely continue conducting hearings and trials. In March, April, and May of 2020, Chief Judge Bredar entered Standing Orders suspending in-court proceedings—including criminal jury trials—and providing that the time period between March 16, 2020 and July 31, 2020 was excluded under the Speedy Trial Act. See In re Standing Orders, Misc. No. 00-308, ECF Nos. 93, 99, 103.

Based on Chief Judge Bredar's initial round of Standing Orders and the parties' joint request for the Hobbs Act Case to reach a conclusion before the Court entered a scheduling order in this case, the government filed a Consent Motion to Exclude Time Pursuant to the Speedy Trial Act on August 3, 2020. ECF No. 18. The Consent Motion referred to, among other things, the public health concerns associated with the global pandemic, Judge Bredar's Standing Orders, and the Defendant's pending Hobbs Act Case. The Consent Motion requested to exclude the time period up to January 2, 2021 from the calculation under the Speedy Trial Act. Id. This Court agreed and granted the motion, finding that the ends-of-justice served by a continuance outweighed the best interests of the defendant and the public in a speedy trial. ECF No. 19. Because the Standing Orders already excluded the time period between March 16, 2020 through July 31, 2020,

and because the Court adopted those exclusions, this Order excluded the time period between March 16, 2020 and January 2, 2021.

The government later filed Consent Motions to exclude Speedy Trial time on February 2, 2021, June 14, 2021, and January 6, 2022.  ECF Nos. 20, 25, 27.  Those motions were based on additional COVID-19 Standard Orders—which suspended criminal jury trials between November 16, 2020 and February 26, 2021, and then again between December 27, 2021 and February 14, 2022—as well as the parties' continued request to allow the Hobbs Act Case to conclude before proceeding in this case.  This Court made the required ends-of-justice findings and granted each motion, resulting in the exclusion of the time period between and January 3, 2021 through January 31, 2022.  ECF Nos. 21, 26, 28.

Each of these continuances were amply justified under the ends-of-justice provision.  In United States v. Pair, the Fourth Circuit held that delays of a trial based on the COVID-19 pandemic constituted valid ends-of-justice continuances.  In that case, the Fourth Circuit observed that it was "abundantly apparent from the record that the district court was aware of the dangers posed by holding trial in the middle of a deadly pandemic and weighed these dangers against the interest in a speedy trial each time it issued a continuance."  84 F.4th at 584.  The court held that the district court "was well within reason to find that delaying trials during the pandemic served the ends of justice and outweighed the interest in speedy trials."  Id. at 855.  The same is true here, and each of the Court's exclusions described above were valid.

Although no additional motions to excluded Speedy Trial time were filed in this case, the record demonstrates that the parties repeatedly and consistently requested to hold this case in abeyance so the Hobbs Act Case—and other relevant proceedings—could reach a resolution.  See supra, Chart Summarizing Joint Status Reports.  Indeed, the parties first made this request in a

status report on April 21, 2020.  ECF No. 17.  The Court approved the request during an April 24, 2020 telephone status conference.  In subsequent status reports, the parties explained to the Court that the Hobbs Act Case was impacting their ongoing plea discussions, and they requested additional time so that they could continue attempting to reach a resolution without the need for a trial.  ECF Nos. 32, 34, 36, 39.  Each time, this Court agreed with the parties' requests, and it allowed for more time for plea discussions to continue, which is a proper basis to exclude time based on an ends-of-justice finding.  See e.g., United States v. White, 920 F.3d 1109, 1115-17 (6th Cir. 2019) (holding that the time for plea negotiations may be excluded after an "ends of justice" finding by the court).  Although the Court was not presented with motions to exclude time under the Speedy Trial Act for these timeframes and may not yet have placed its findings on the record as required under the Speedy Trial Act, "it is clear from the record that the court conducted the mandatory balancing contemporaneously with the granting of the continuance."  Pair, 84 F.4th at 584 (internal quotations omitted).

The government requests that the Court document its ends-of justice findings on the record of this case prior to ruling on the Defendant's Motion to Dismiss.[11]  Specifically, the government requests that the Court place findings on the record that the continuance while the appeals in the Hobbs Act Case were pending (October 22, 2021 through February 21, 2023) and the post-appeal timeframe during which the parties continued negotiating a plea agreement (February 21, 2023 through September 21, 2023) served the ends of justice and outweighed the interest in a speedy trial.

---

[11]  The Court has arguably already stated its reasons on the record when it described the delay in this case after the Defendant declined to enter a guilty plea on October 6, 2023.  **Exhibit 7** at 3-5.

Moreover, the Court should place findings on the record that the timeframe between October 6, 2023 (when the Defendant appeared for a guilty plea but decided not to enter it) and December 8, 2023 (when the Defendant filed his pretrial motions in this case) are excluded under the ends-of-justice provision.  The government also requests that the Court also place findings on the record that the continuance up to the beginning of trial, scheduled for April 15, 2024, is also excluded under the ends-of-justice provision.  To be sure, after the Defendant decided not to enter a guilty plea on October 6, 2023, the Court indicated it wanted to get this case tried as quickly as possible.  But defense counsel asked to delay trial until a date that would allow for the filing of pretrial motions.  **Exhibit 7** at 6.  Counsel subsequently contacted Chambers and selected a mutually agreeable schedule, which set a deadline of December 8, 2023 for the filing of defense motions and scheduled trial to begin on April 15, 2024.  ECF No. 49.  The time needed to prepare and file pretrial motions and the time needed to prepare for trial are properly excludable under the ends-of-justice provision.  See Bloate, 559 U.S. at 203 (holding that time for preparation of pretrial motions may be properly excludable under the "ends of justice" exclusion); United States v. Jarrell, 147 F.3d 315, 318 (4th Cir. 1998) (explaining that "time allowed for the preparation and filing of pretrial motions is excludable from the speedy trial calculation if granted in accordance with § 3161(h)(8)" and noting that "[t]he granting of additional time for the preparation and filing of pretrial motions fits comfortably within the category of delays that may be 'necessary for effective preparation'"); 18 U.S.C. § 3161(h)(7)(B)(iv) (listing the time needed for effective preparation as a proper factor to consider under the ends-of-justice analysis).

### iii.   Summary of excluded time under the Speedy Trial Act.

Based on the automatic exclusions and the end-of-justice continuances discussed above, the following timeframes (some of which are overlapping) are excluded from the Speedy Trial Act calculation:

1.   January 20, 2020 – February 21, 2023, automatic exclusion based on the trial, sentencing, and appeals in the Hobbs Act Case;

2.   March 13, 2020 – March 27, 2020, automatic exclusion based on the Defendant's motion for a detention hearing;

3.   March 16, 2020 – January 31, 2022, ends-of-justice exclusions based on the COVID-19 pandemic and the parties' request to hold this case in abeyance;

4.   October 22, 2021 – February 21, 2023, ends-of-justice exclusion based on the parties' plea discussions while the Hobbs Act Case was on appeal;

5.   August 12, 2022 – October 4, 2023, automatic exclusion based on the Defendant's state court post-conviction litigation;

6.   February 21, 2023 – September 21, 2023, ends-of-justice exclusion based on the parties' continued plea negotiations after the appeal in the Hobbs Act Case was concluded;

7.   September 21, 2023 – October 6, 2023, automatic exclusion based on the parties' plea negotiations and the Court's consideration of the parties' proposed plea agreement;

8.   October 6, 2023 – December 8, 2023, ends-of-justice exclusion based on the Defendant's request to prepare and file pretrial motions;

9.   December 8, 2023 through the disposition of pretrial motions, automatic exclusion based on the Defendant's filing of pretrial motions; and

10.   October 6, 2023 – April 15, 2024, ends-of-justice exclusion based on the time needed for effective preparation for trial.

As this timeline demonstrates, every day that this case has been pending is properly excluded under the Speedy Trial Act.  Accordingly, the Defendant's motion to dismiss the indictment based on a Speedy Trial Act violation should be denied.

## B. The Defendant's Constitutional Speedy Trial Rights Were Not Violated.

Despite his numerous requests to hold this case in abeyance until after the Hobbs Act Case and other matters had reached a resolution, the Defendant now claims that his constitutional speedy trial rights were violated. The Defendant is wrong and his motion to dismiss should be denied.

To establish a violation of the Sixth Amendment right to a speedy trial, the Defendant must "show that on balance, four separate factors weigh in his favor." United States v. Thomas, 55 F.3d 144, 148 (4th Cir. 1995). Those factors are the: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Barker v. Wingo, 407 U.S. 514, 530 (1972).[12] On balance, these factors weigh against the Defendant's claim that his speedy trial rights were violated.

Trial in this case will occur more than four years after the Defendant's indictment and initial appearance. Because the length of delay exceeds one year, it is considered "presumptively prejudicial," which, "in this threshold context … simply marks the point at which courts deem the delay unreasonable enough to trigger the Barker enquiry." Doggett v. United States, 505 U.S. 647, 652 n.1 (1992). The length of delay here favors the Defendant. But each of the remaining Barker factors favor the government.

Turning to the second Barker factor, "[t]he reasons for a trial delay should be characterized as either valid, improper, or neutral." United States v. Hall, 551 F.3d 257, 272 (4th Cir. 2009). Deliberate delay to hamper the defense weighs heavily against the prosecution," while "delay

---

[12]   These four factors have also been described as: "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." Doggett v. United States, 505 U.S. 647, 651 (1992).

caused by the defense weighs against the defendant." <u>Vermont v. Brillon</u>, 556 U.S. 81, 90 (2009) (internal quotation marks omitted).  There was no deliberate delay to hamper the defense in this case.  Quite the contrary.  The delay here was at the request of the Defendant and the government to allow for other proceedings involving the Defendant to conclude because, as the parties explained, those proceedings were impacting the parties' plea discussions.  Indeed, the status reports made clear that the Defendant wanted to wait until the Hobbs Act Case and his post-conviction litigation was finally resolved so he could decide whether to resolve this case with a guilty plea.  The delay benefited the Defendant as it allowed him to make a more informed decision regarding whether to enter a guilty plea in this case.  Moreover, delaying trial to allow for the parties to engage in plea discussions is unquestionably valid because successful plea negotiations would conserve judicial resources.  In addition, part of the delay here was attributable to COVID-19 and the Court's limited operations.  The Fourth Circuit has found that delays associated with COVID-19 were justified in the Sixth Amendment context.  <u>See</u> <u>Pair</u>, 84 F.4th at 589 (finding that the COVID-19 pandemic was a valid reason for delay).  Because the reasons for the delay in this case were valid, this factor weighs strongly in favor of the government.

The third <u>Barker</u> factor is "the timeliness and vigor of the assertion of the speedy trial guarantee."  <u>Hall</u>, 551 F.3d at 271.  While "[f]ailure to assert the right to a speedy trial, and even the explicit waiver of that right, is not dispositive of a Sixth Amendment speedy-trial claim," if a defendant fails to assert the right it will be difficult for him to "prove that he was denied a speedy trial."  <u>Thomas</u>, 55 F.3d 144, 150 (4th Cir. 1995) (internal quotation marks omitted).  Here, the Defendant's assertion of his speedy trial right was extremely delayed.  Throughout the entire pendency of this case, the Defendant affirmatively disclaimed his desire for a trial.  Instead, the Defendant engaged in plea discussions with the government and repeatedly submitted joint

requests to delay setting a trial schedule.  Although the Defendant first appeared on this charge in March 2020, it was not until December 8, 2023—the date the Defendant's pretrial motions were due—that the Defendant claimed that his speedy trial rights were violated.  In fact, even after the Defendant decided not to enter a guilty plea on October 6, 2023, the Defendant did not mention his speedy trial rights.  Rather, when the Court said it would try to get the case tried as quickly as possible, counsel for the Defendant requested more time to prepare and file pretrial motions.  The Defendant did not voice any opposition.  The third <u>Barker</u> factors weighs heavily against the Defendant's claim of a speedy trial violation.

Finally, the fourth <u>Barker</u> factor favors the government because the Defendant has failed to demonstrate prejudice.  When considering the delay's adverse impact on the defense, courts "consider three interests of defendants: '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.'"  <u>United States v. Robinson</u>, 55 F.4th 390, 400 (4th Cir. 2022) (quoting <u>Barker</u>, 407 U.S. at 532).  "The third interest is the 'most serious … because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'"  <u>Id.</u> (quoting <u>Barker</u>, 407 U.S. at 532).  Here, the Defendant claims that he was subjected to oppressive pretrial incarceration because he "spent most of the period of delay in pretrial detention at CDF during the Covid 19 pandemic."  Defendant's Motion to Dismiss, ECF No. 50, at 4.  But the Defendant was not in custody because of this case—he was in primary custody in the Hobbs Act Case.  The Defendant also argues that he "suffered anxiety and concern as a result of the pending charge."  Defendant's Motion to Dismiss, ECF No. 50, at 4.  This is insufficient on its own to establish prejudice.  <u>See</u> <u>United States v. Ballard</u>, 727 F. App'x 757, 761 (4th Cir. 2018) ("Ballard's generalized claims of anxiety are insufficient to establish prejudice.").  Finally, with regard to impairment of his defense,

the Defendant does not even claim that the delay has impacted his ability to defend this case.  He has not identified any exculpatory evidence that was lost, nor has he identified any evidence that is unavailable because of the delay.  <u>See</u> <u>United States v. Reavis</u>, 48 F.3d 763, 770 n.2 (4th Cir. 1995) (noting that the defendant's inability to demonstrate that delay impaired ability to mount defense was among four factors leading to conclusion that delay between indictment and trial did not constitute denial of right to speedy trial); <u>Pair</u>, 84 F.4th at 590 ("Pair's inability to show any prejudice to his defense from the delay is quite harmful to his [speedy trial] claim.").  The fourth <u>Barker</u> factor weighs strongly in favor of the government.

Because the Defendant cannot show that, on balance, the <u>Barker</u> factors weigh in his favor, the Defendant's motion to dismiss should be denied.

## II.   The Court Should Deny the Defendant's Motion to Suppress Tangible and Derivative Evidence.

The Defendant's lacks Fourth Amendment standing to challenge the seizure of the firearm. He threw it into a public parking lot while fleeing from the police.  Additionally, the Fourth Amendment is not even implicated because the Defendant refused to submit to law enforcement's show of authority.  Even if he has standing and the Fourth Amendment applies, the police had ample justification to initiate a traffic stop.  The Defendant's motion should be denied.

### A.   The Defendant lacks Fourth Amendment standing to challenge the seizure of the firearm because the Defendant did not have a reasonable expectation of privacy in the public parking lot on Belair Road where the firearm was recovered and because he abandoned the firearm.

Before the Court can address the Defendant's claim that the evidence gathered in this case should be suppressed, the Defendant must first establish that he may assert Fourth Amendment protections by showing that he had a reasonable expectation of privacy in the place searched.  "It is axiomatic that suppression of the product of a Fourth Amendment violation can be successfully

urged *only* by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." United States v. Gray, 491 F.3d 138, 144 (4th Cir. 2007) (emphasis in original; internal quotations omitted). A person's "capacity to claim the protection of the Fourth Amendment depends … upon whether the person who claims the protection … has a legitimate expectation of privacy in the invaded place." Minnesota v. Carter, 525 U.S. 83, 88 (1998) (quoting Rakas v. Illinois, 439 U.S. 128, 143 (1978)). As a result, the court must focus its analysis on the area that was searched rather than the items that were found. See United States v. Manbeck, 744 F.2d 360, 374 (4th Cir. 1984) ("The privacy interest that must be established to support standing is an interest in the area searched, not an interest in the items found."). Therefore, "if the individual seeking to challenge a search does not have a legitimate expectation of privacy in the property or place being searched, the individual lacks 'standing' and the inquiry ends without consideration of the merits of the search claim." United States v. Ferebee, 957 F.3d 406, 417 (4th Cir. 2020).

Importantly, "[t]he burden of showing a legitimate expectation of privacy in the area searched rests with the defendant." United States v. Castellanos, 716 F.3d 828, 832 (4th Cir. 2013). To satisfy this burden, the defendant must satisfy two prongs by a preponderance of the evidence. See id. at 833. First, the defendant "must have a subjective expectation of privacy." United States v. Bynum, 604 F.3d 161, 164 (4th Cir. 2010). Second, that subjective expectation of privacy must be "objectively reasonable; in other words, it must be an expectation that society is willing to recognize as reasonable." United States v. Bullard, 645 F.3d 237, 242 (4th Cir. 2011) (internal quotations omitted).

Moreover, "[t]he law is well established that a person who voluntarily abandons property loses any reasonable expectation of privacy in the property and is consequently precluded from

seeking to suppress evidence from the property." Ferebee, 957 F.3d at 412.   A finding of abandonment rests on "whether the complaining party retains a reasonable expectation of privacy in the articles alleged to be abandoned." United States v. Small, 944 F.3d 490, 502 (4th Cir. 2019). To make this determination, the court performs an objective analysis—considering the defendant's actions and intentions—to determine whether he maintains a reasonable expectation of privacy in an item. Id. "Intent to abandon may be inferred from words spoken, acts done, and other objective facts." Id. (internal quotations omitted).

Here, the Defendant cannot show by a preponderance of evidence that he has standing to challenge the seizure of the firearm in this case.   First, the Defendant did not have a reasonable expectation of privacy in the place searched—a public parking lot near the intersection of Belair Road and Overlea Avenue.   Indeed, the Defendant cannot credibly claim that he had a subjective expectation of privacy in the public parking lot, nor can he show that such a subjective expectation of privacy would be viewed as objectively reasonable.   For this reason, the Defendant lacks standing to challenge the seizure of the firearm.   In addition, the Defendant's actions—throwing the firearm out the window of his car while he fled from police—demonstrate that the Defendant intended to abandon the firearm.  See e.g., United States v. Baker, 326 F. App'x 213, at *1 (4th Cir. April 21, 2009) (per curiam) (holding that "because [the defendant] abandoned the firearm and cocaine base by throwing them out of his window during the pursuit, he cannot challenge their seizure").   Because he abandoned the firearm, the Defendant cannot challenge its seizure. Accordingly, the Defendant cannot assert Fourth Amendment protections with respect to the firearm and the Court should deny his motion to suppress tangible and derivative evidence.

**B.   The Defendant was not seized within the meaning of the Fourth Amendment when he threw the firearm out of the window of the blue Acura because the Defendant had not submitted to law enforcement's show of authority.**

The Defendant argues that the police pursuit in this case "was a demonstration of authority" and that the firearm "was recovered *following* the submission to a show of authority." Defendant's Motion to Suppress, ECF No. 53, at 4 (emphasis added). The Defendant's claim is inconsistent with the facts of this case. Because the Defendant did not submit to law enforcement's show of authority, a seizure did not occur within the meaning of the Fourth Amendment prior to the Defendant throwing the firearm out of the window of his car.

A seizure implicating the Fourth Amendment does not occur until an "officer, by means of physical force or show of authority, has in some way restrained the liberty of" the individual. Terry v. Ohio, 392 U.S. 1, 20 n. 16 (1968). Not only that, but the defendant must submit to the physical force or show of authority for there to be a seizure. California v. Hodari D., 499 U.S. 621, 626 (1991). Indeed, it is settled law that the individual "who flees the police in response to an assertion of authority has not been seized, and thus his Fourth Amendment rights are not implicated." United States v. Brown, 401 F.3d 588, 594 (4th Cir. 2005).

Here, when the Defendant threw the firearm out of the window of his blue Acura, he was not seized and his Fourth Amendment rights are not implicated. The evidence at the suppression hearing will show that after Officer Galligan positioned his patrol car behind the Defendant's blue Acura—but before he attempted to initiate a traffic stop—the Defendant began accelerating away from Officer Galligan. At that point, Officer Galligan activated his emergency lights and sirens and attempted to pull over the Defendant. A police officer activating his emergency lights and sirens and attempting a traffic stop is unquestionably a show of authority. But importantly, the Defendant did not submit to that show of authority here. Instead, the Defendant took the police

36

on a high speed, dangerous pursuit covering 7.4 miles in a little more than 8 minutes.  It was not until the Defendant finally stopped his car—in a residential area in Baltimore County—that he submitted to law enforcement authority.  At that point, the Defendant was seized.  But during the Defendant's flight from police, well before he stopped his car, the Defendant threw a firearm out of the window of his car.  Because the Defendant did not submit to the officers' show of authority at the time he threw the firearm, a seizure had not occurred and the Fourth Amendment was not implicated.  Accordingly, the Court should deny the Defendant's motion to suppress.

**C.  Assuming the Defendant had been seized when he threw the firearm out of the window of the blue Acura, the seizure was justified because law enforcement had reasonable suspicion to conduct a traffic stop.**

The Defendant argues that the firearm and derivative evidence should be suppressed because the initial pursuit of the Defendant's vehicle amounted to a warrantless seizure without probable cause.  Defendant's Motion to Suppress, ECF No. 53, at 3.  The Defendant claims that "the fact that police observed a vehicle that generally matched the description of another vehicle involved in an unrelated incident was not sufficient, by itself, to establish probable cause for the warrantless pursuit and seizure" of the Defendant's vehicle.  Id.  The Defendant's argument misunderstands the law and the facts.

Starting with the law, the Defendant incorrectly claims that for a traffic stop to be valid, it must be supported by *probable cause*.  The Defendant misstates the applicable legal standard.  The Fourth Circuit has made clear that "[b]ecause a traffic stop is more akin to an investigative detention than a custodial arrest, this Court applies the Terry v. Ohio, 392 U.S. 1 (1968) standard in determining the constitutionality of the stop."  United States v. Bernard, 927 F.3d 799, 805 (4th Cir. 2019).  For a vehicle stop to be valid under the Fourth Amendment, the stop "much be justified by probable cause *or a reasonable suspicion*, based on specific and articulable facts, of unlawful

conduct." United States v. Wilson, 205 F.3d 720, 723 (4th Cir. 2000) (en banc) (cleaned up and emphasis added); United States v. Harris, 39 F.3d 1262, 1269 (4th Cir. 1994) (explaining that a traffic stop is justified at its inception if it is based "on a reasonable suspicion of illegal activity").

Regarding the facts, the Defendant is also incorrect that Officer Galligan's observation of the Defendant's blue Acura matching the description of the suspect vehicle from Sgt. Carrington's shooting was the sole basis for the traffic stop. Not only did the Defendant's blue Acura match the description of that vehicle, but Officer Galligan also observed that the Defendant's vehicle likely had illegally tinted windows and was not displaying a front license. Each of those observations provided independent reasons for the traffic stop.

It is beyond dispute that "[w]hen an officer observes a traffic offense—however minor— he has probable cause to stop the driver of the vehicle." United States v. Williams, 740 F.3d 308, 312 (4th Cir. 2014); see also United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008) ("Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop."). Indeed, the Supreme Court has stated "it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." Arizona v. Johnson, 555 U.S. 323, 327 (2009); see also United States v. Anderson, 114 F.3d 1059, 1063-64 (4th Cir. 1997) (explaining that a traffic stop is valid under the Fourth Amendment "if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring") (internal quotation marks omitted). It is not relevant that law enforcement officers may have other motivations for their traffic stop, such as investigating other criminal activity. See United States v. Hassan El, 5 F.3d 726, 730 (4th Cir. 1993) ("[I]f an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon

the Fourth Amendment.  That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity.").

Here, the traffic stop was justified because it was based on the officer's reasonable suspicion that the Defendant's vehicle had illegally tinted windows and lacked the required front license plate.  Regarding the tinted windows, "a person may not operate a vehicle … on a highway of this State if … there is affixed to any window of the vehicle any tinting materials added to the window after manufacture of the vehicle that do not allow a light transmittance through the window of at least 35%."  Md. Code, Transp. § 22-406(i)(1)(i).  In other words, post-manufacture tinting is permissible if it allows at least 35% light transfer through the windows.  The Maryland Code expressly authorizes a police officer who observes a vehicle being operated in violation of the above-stated tinting limits to "stop the driver of the vehicle and, in addition to a citation charging the driver with the offense, issue to the driver a safety equipment repair order."  Id. § 22-406(i)(2).  With respect to displaying a front license plate, Maryland law provides that "[o]n a vehicle for which two registration plates are required, one plate shall be attached on the front and the other on the rear of the vehicle."  Id. § 13-411(a).  Two registration plates are issued to all vehicles except motorcycles, tractors, trailers, and historic vehicles or street rods that were manufactured at least 50 years before the current model year.  Id. § 13-410(a).  In this case, the traffic stop was valid because it was based on both a traffic violation and an equipment violation, and the Court should reject the Defendant's arguments to the contrary.

Moreover, the traffic stop here was not attempted until after Officer Galligan observed the Defendant's blue Acura begin to accelerate away at a high rate of speed.  See id. § 21-801.1(a) (prohibiting a person from driving a vehicle at a speed that exceeds a posted maximum speed limit); id. § 21-801(a) (prohibiting a person from driving a vehicle "at a speed that, with regard to

the actual and potential dangers existing, is more than that which is reasonable and prudent under the conditions"). Officer Galligan also observed the Defendant operating his vehicle recklessly and negligently, in violation of Md. Code, Transp. §§ 21-901.1(a), (b), as well as in violation of several other traffic laws. See **Exhibit 3**. In short, there were myriad traffic and equipment violations that Officer Galligan observed that justified the traffic stop.

Independent of the traffic and equipment violations, Officer Galligan was justified in stopping the Defendant's because he had reasonable articulable suspicion that the Defendant's vehicle was involved in the shooting of Sgt. Carrington two days earlier. See Harris, 39 F.3d at 1269 (upholding an investigatory stop of a vehicle based on reasonable suspicion of criminal activity where officers received information from a known reliable informant that the defendant was selling drugs, used a specific vehicle to make drug deliveries, and was about to leave to make a drug delivery in that vehicle). For this additional reason, the traffic stop of the Defendant's vehicle was supported by reasonable suspicion.

> **D. Because the seizure of the firearm did not implicate the Fourth Amendment and, in any event, was justified under the Fourth Amendment, each of the Defendant's arguments concerning the suppression of evidence fail.**

The Defendant claims that the stop of his vehicle was unlawful and, therefore, his arrest and post-arrest custodial statements were the fruit of the unlawful arrest. Defendant's Motion to Suppress, ECF No. 53, at 4. The Defendant also argues that the search warrant for the blue Acura was tainted by information derived from the unlawful seizure and that after that information is excised, the affidavit lacks probable cause. Id. at 5. As explained above, the recovery of the firearm does not implicate the Fourth Amendment because the Defendant does not have standing to challenge it and because he was not seized when he threw it out the window. Alternatively, if the Court determines the Defendant has standing and was seized when he threw the firearm out

the window, the seizure was supported by reasonable articulable suspicion.  Therefore, each of the Defendant's arguments concerning fruit of the poisonous tree necessarily fail.  The Defendant's motion should be denied.

### III.   The Court Should Deny the Defendant's Motion to Suppress Statements Because They Were Given After a Valid <u>Miranda</u> Waiver and Were Voluntary.

Prior to speaking with law enforcement following his arrest, the Defendant knowingly and voluntarily waived his <u>Miranda</u> rights.  The officers were calm and cordial throughout the interview, and there is no evidence of intimidation or coercion.  The Defendant unequivocally expressed a desire to speak with the officers and did so freely.  Accordingly, his post-arrest statements are admissible, and the Defendant's boiler plate motion should be denied.

#### A.   Legal Standards.

The Fifth Amendment guarantees that "[n]o person … shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  To protect this right, the Supreme Court in <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966), adopted prophylactic procedural rules that must be followed in custodial interrogations.  <u>United States v. Parker</u>, 262 F.3d 415, 419 (4th Cir. 2001).  In general, any statements elicited from a suspect without first advising the suspect of his rights to remain silent and to counsel are inadmissible in the prosecution's case-in-chief.  <u>Id.</u>  An individual is "in custody" for <u>Miranda</u> purposes when, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a degree associated with formal arrest."  <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984).

Although the government concedes that the Defendant was in "custody" for <u>Miranda</u> purposes, <u>see</u> <u>e.g.</u>, <u>United States v. Giddins</u>, 858 F.3d 870, 879 (4th Cir. 2017) (asking "whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and

leave" (quoting United States v. Hashime, 734 F.3d 278, 282–83 (4th Cir. 2013))), statements made in response to custodial interrogation are admissible notwithstanding a defendant's Fifth and Sixth Amendment rights where, as here: (1) the defendant was advised in accordance with Miranda and knowingly, intelligently, and voluntarily waived those rights, see e.g., United States v. Holmes, 670 F.3d 586, 591 (4th Cir. 2012); and (2) the defendant's statements were not otherwise involuntarily obtained, see e.g., United States v. Cristobal, 293 F.3d 134, 142 (4th Cir. 2002).

A Miranda waiver is valid when "the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension." Moran v. Burbine, 475 U.S. 412, 421 (1986) (internal quotation marks omitted).

A waiver bears the "requisite level of comprehension" when it is "knowing and intelligent," Correll v. Thompson, 63 F.3d 1279, 1288 (4th Cir. 1995)—that is, when it is made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," Moran, 475 U.S. at 421. Whether the waiver was made with "full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it" requires examining "the totality of the circumstances surrounding the interrogation, including the suspect's intelligence and education, age and familiarity with the criminal justice system, and the proximity of the waiver to the giving of Miranda warnings." United States v. Dire, 680 F.3d 446, 474 (4th Cir. 2012) (quoting Correll, 63 F.3d at 1288).

A waiver is the product of an "uncoerced choice"—i.e., the waiver is "voluntary"—when it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran, 475 U.S. at 421. For a waiver to be involuntary, it must be "extracted by . . . threats or violence," or "obtained by … direct or implied promises" or "the exertion of … improper influence." United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997) (en banc). Accordingly,

"[c]oercive police activity is a *necessary predicate* to a finding that . . . a waiver of <u>Miranda</u> rights is not voluntary." <u>Cristobal</u>, 293 F.3d at 140–41 (emphasis added). The central question "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired'" as a consequence of "coercive police conduct." <u>Id.</u> at 140 (quoting <u>United States v. Pelton</u>, 835 F.2d 1067, 1071 (4th Cir. 1987)). To answer this question, courts examine "the totality of the circumstances," including the defendant's individual characteristics and background, the setting in which the statement occurred, and the details of the interview. <u>United States v. Elie</u>, 111 F.3d 1135, 1143-44 (4th Cir. 1997).

Once a defendant has validly waived his <u>Miranda</u> rights, the defendant's statement is admissible unless it is nonetheless involuntary under the Fifth Amendment, as defined by the Due Process Clause. A statement is involuntary for Due Process purposes when the statement is "extracted by . . . threats or violence," or "obtained by . . . direct or implied promises" or "the exertion of . . . improper influence." <u>Braxton</u>, 112 F.3d at 780 (internal quotation marks omitted). Thus, courts assess Due-Process voluntariness using "the same inquiry when analyzing the voluntariness of a <u>Miranda</u> waiver." <u>Cristobal</u>, 293 F.3d at 140 (citing <u>Colorado v. Connelly</u>, 479 U.S. at 169). Accordingly, the question is, again, "whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired'" because of "coercive police conduct," <u>Cristobal</u>, 293 F.3d at 140 (quoting <u>Pelton</u>, 835 F.2d at 1071), which requires examining "the totality of the circumstances," including the defendant's individual characteristics and background, the setting in which the statement occurred, and the details of the interview, <u>Elie</u>, 111 F.3d at 1143-44.

**B. The Defendant was properly advised of his <u>Miranda</u> rights, which he knowingly and voluntarily waived when he chose to speak to law enforcement.**

A <u>Miranda</u> waiver is "knowing and intelligent" when it is made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," <u>Moran</u>, 475 U.S. at 421, which is evaluated based on the totality of the circumstances, including the suspect's intelligence and education, age and familiarity with the criminal justice system, and the proximity of the waiver to the giving of Miranda warnings," <u>Dire</u>, 680 F.3d at 474.  At the time of his arrest, the Defendant was 30 years old and had extensive experience in the criminal justice system.  He had been convicted 10 prior times and was arrested numerous other times in cases that were dismissed.  <u>See</u> Presentence Investigation Report, Case No. 18-cr-00408-JKB, ECF No. 153.  The Defendant was also a high school graduate and working as an environmental field technician.  In other words, he had the capacity to understand the consequences of his decision to waive his rights.

As the Court will observe on the video, Detectives Reichenberg read the Defendant his rights and further explained that the Defendant could stop the conversation at any time.  The Defendant waived his rights by signing a waiver of rights form.  <u>See</u> **Exhibit 4**.  It was only then that the officers began to ask him substantive questions about the case.  There is no evidence to suggest that the Defendant did not understand the nature of the circumstances and the consequences of his decision.  His waiver was "knowing and intelligent."[13]

---

[13]  "What the caselaw means by intelligent is that the suspect is fully aware of the consequences of his decision to abandon <u>Miranda</u> rights."  <u>Hoang</u>, 238 F. Supp. 3d at 784 n.6 (citing <u>Moran</u>, 475 U.S. at 421).  The Fifth Amendment "does not require that a suspect's decision to waive his <u>Miranda</u> rights be either smart or sensible, nor does the Fifth Amendment require 'that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege.'"  <u>Id.</u> (quoting <u>Colorado v. Spring</u>, 479 U.S. 564, 574 (1987)).

The Defendant's waiver was also voluntary.  The officers were cordial and pleasant.  After entering the interview room, Detective Reichenberg removed the Defendant's handcuffs and asked the Defendant whether the leg shackles were too tight.  The Defendant was then provided with a bottle of water.  While waiting for the officers to return to the interview room, the Defendant was free to walk around the room.  Detectives Reichenberg and O'Connor, the agents leading the interview, were both in plain clothes and their weapons were not exposed.  In fact, per policy, they secured their firearms in lockers before entering the interview room.  Furthermore, the detectives were calm and friendly throughout the interview.  At various points in the conversation, the Defendant and detectives laughed and joked around.  At the end of the short, approximately 25-minute, interview, the Defendant shook hands with the detectives.  At no point in the discussion did the detectives raise their voices or make any explicit or implied threats.  There was not even the hint of coercion.  The Defendant unequivocally expressed that he wanted to speak with the detectives, and they engaged with him in a calm demeanor.  Accordingly, the Defendant's waiver was voluntary.

Finally, for all those same reasons, the Defendant's statement was otherwise voluntary. The context of the interview—that the Defendant was being questioned as a suspect in a non-fatal shooting of an officer—has no bearing on the voluntariness of his statement.  The detectives were transparent with the Defendant and explained why they were questioning him.  The Defendant was unquestionably motivated to clear his name, but, if anything, that supports the voluntary nature of his statement.  He knew why he was there, understood the circumstances, and hoped that speaking with the detectives would work to his benefit.  "Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' …."  Colorado v. Connelly, 479 U.S. 157, 167 (1986).  Here, despite the serious nature of the investigation, there is no evidence that law

45

enforcement engaged in any coercive conduct.  They made no threats or promises—direct or implied—and the Defendant's will was not "overborne."  <u>Cristobal</u>, 293 F.3d at 140 (quoting <u>Pelton</u>, 835 F.2d at 1071).  Accordingly, the Defendant's motion to suppress statements should be denied.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny the Defendant's Motion to Dismiss Indictment, Motion to Suppress Evidence, and Motion to Suppress Statements.

Respectfully submitted,

Erek L. Barron
United States Attorney

By:          /s/                   
Anatoly Smolkin
Ari D. Evans
Assistant United States Attorneys

36 South Charles Street, Fourth Floor
Baltimore, MD 21201
Tel.: (410) 209-4800
Fax: (410) 962-3124
<u>Anatoly.Smolkin@usdoj.gov</u>
<u>Ariel.Evans@usdoj.gov</u>

Dated:  January 26, 2024

46

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Criminal No. ELH-20-0034** |
| **CHARVEZ BROOKS,** | * | |
| **Defendant.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### Exhibits to the Government's Consolidated Response Brief

1.  Map of Travel from 3400 Belair Road to 5600 Summerfield Avenue

2.  Map of Travel from 4200 Belair Road to Plantagenet Circle

3.  Traffic Citations Issued to Charvez Brooks on August 10, 2019

4.  Signed <u>Miranda</u> Explanation and Waiver of Rights Form

5.  January 11, 2022, E-mail from Joseph Balter to Anatoly Smolkin

6.  Compilation of Joint Status Reports, ECF Nos. 17, 32, 34, 36, 39, 41

7.  Transcript from October 6, 2023 Hearing before Judge Hollander

8.  Docket Sheet, Howard County Circuit Court, Case No. 13-K-12-052364

9.  Docket Sheet, Appellate Court of Maryland, Case No. ACM-ALA-0920-2023