IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.                                              Criminal No. ELH-20-034

CHARVEZ BROOKS

*Defendant*.

## MEMORANDUM OPINION

Defendant Charvez Brooks is charged with the offense of unlawful possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g).  ECF 1.  He has moved to suppress the firearm, which was recovered by law enforcement on August 10, 2019, after defendant allegedly threw it from his car window onto a parking lot during a car chase.  ECF 53 ("Motion to Suppress Evidence").  Defendant has also moved to suppress custodial statements made after his arrest.  ECF 52 ("Motion to Suppress Statements").

The car chase occurred after Officer Thomas Galligan, at the time an officer in the Baltimore City Police Department ("BPD")[1], noticed that the vehicle Brooks was driving matched the description of a vehicle believed to have been involved in the shooting of a police officer two days earlier.  During the pursuit, bystanders observed Brooks throw a gun from the passenger window of his car onto a parking lot.  A stop was eventually effected, and defendant was arrested. He was transported to the BPD for questioning.

---

[1] Officer Galligan is now an officer in the Metropolitan Transportation Authority Police Department in New York City.

In support of the Motion to Suppress Evidence, defendant has submitted a copy of a Search Warrant (ECF 55) authorizing the search of the car. The Search Warrant includes an Affidavit by Officer Galligan describing the circumstances of defendant's arrest. *Id.* at 4–6.[2]

In a combined submission, the government opposes both motions. ECF 72 ("Opposition"). The Opposition is supported by several exhibits. *See* ECF 72-1; ECF 72-2; ECF 72-3; ECF 72-4. Defendant did not reply.

On March 7 and March 8, 2024, the Court held a hearing on the Motions, at which both evidence and argument were presented. ECF 78; ECF 84. The government introduced sixteen exhibits and presented the testimony of former BPD Officer Galligan, BPD Officer Kristopher Hayes, and BPD Detective Ryan O'Connor. The government also played portions of video taken from the body worn cameras of Officer Galligan and Officer Hayes. In addition, the government played the video recording of defendant's custodial interview. Counsel for defendant introduced two exhibits: a "Personal Information" form completed by BPD Detective Shawn Reichenberg during his interview of defendant, and a photograph of the 6800 block of Belair Road in Baltimore.

For the reasons that follow, I shall deny the motions.

---

[2] In the Motion to Suppress Evidence, defendant also seeks to suppress evidence recovered from the vehicle, on the ground that it was the product of an unlawful seizure. At the Motion hearing, however, defense counsel suggested for the first time that the search warrant itself is defective.

By letter dated March 13, 2024 (ECF 87), the government advised the Court that it "has determined that it does not intend to offer any evidence obtained pursuant to that search [of the car] in the government's case-in-chief." Therefore, I need not address any challenge to the items recovered in connection with the search of the vehicle.

# I.   Factual Background[3]

On August 8, 2019, at about 3:26 p.m., multiple BPD officers responded to a nonfatal shooting in the 5600 block of Summerfield Avenue in Baltimore City.  ECF 72 at 5–6.  The victim of the shooting was BPD Sergeant Isaac Carrington.  *Id.* at 6.  Officer Galligan and Officer Calvin Kreiter were among the officers who responded to the scene.  *Id.*  Although Sergeant Carrington survived the shooting, he was left paralyzed.  *Id.*  I pause to note that defendant has been cleared of any involvement in the shooting of Sergeant Carrington.  *Id.* at 10 n.6.

After the shooting, BPD detectives distributed photographs and a description of a vehicle believed to have been linked to the shooting.  In particular, on August 9, 2019, the BPD distributed a "Be On The Lookout" or "BOLO" notice that identified the suspect vehicle as a "Metallic Blue Acura TL four door vehicle."  Government's Exhibit 1 ("BOLO Notice").  The BOLO Notice stated, in part, *id.*:

> In reference to the non-fatal shooting of Sgt. Isaac Carrington that occurred at the 5600 block of Summerfield Avenue, Detectives are attempting to locate the above picture vehicle . . . . USE CAUTION AS THE OCCUPANTS ARE CONSIDERED ARMED AND DANGEROUS.

The BOLO Notice included two photographs of the suspect vehicle.  *Id.*  The vehicle shown in the photographs has a metallic blue color, tinted windows, a chrome grill, and chrome markings on the front bumper.  *Id.*  Notably, the photographs also show that the suspect car did not have a

---

[3] I prepared the factual summary without the benefit of a transcript of the hearing. Therefore, I have used my notes from the hearing.

I have, of course, relied on the evidence introduced at the hearing.  But, for convenience, I sometimes cite to uncontested portions of the government's statement of facts in its Opposition (ECF 72 at 5–11) and to Officer Galligan's Affidavit in support of the Search Warrant.  *See* ECF 55 at 4–6.

front license plate.  *Id.*  Officer Galligan saved a picture of the suspect vehicle as the background to his cell phone.

On August 10, 2019, at about 11:49 a.m., Officers Galligan and Kreiter were on routine patrol, in separate vehicles, in the Northeast District of Baltimore City.  Officer Galligan was parked facing southbound in the 3400 block of Belair Road, approximately 2.4 miles from the 5600 block of Summerfield Avenue, where Sergeant Carrington had been shot two days earlier.  ECF 55 at 4; ECF 72 at 6; ECF 72-1.  As Officer Galligan was facing southbound, he noticed a metallic blue Acura without a front license plate and with tinted windows, driving northbound on Belair Road.  ECF 55 at 4; Government's Exhibit 4 (video from Officer Galligan's body-worn camera) at 21:34–21:40.  Because Belair Road is a busy street, Officer Galligan briefly activated his emergency lights to make a U-turn.  Government's Exhibit 4 at 21:05–21:10.  However, Officer Galligan turned off his emergency lights as soon as he completed the turn.  *Id.* at 21:12–21:25.  He then began traveling northbound on Belair Road.  ECF 72 at 6.  Galligan attempted to stay as close to the Acura as possible.

As Officer Galligan followed the Acura, he requested additional units to the area and provided the BPD dispatcher with the license plate number of the blue Acura.  ECF 72 at 6–7.  Officer Kreiter was nearby, driving northbound on Belair Road.  *Id.* at 7.

While the Acura was in the 4300 block of Belair Road, the driver began to accelerate.  At the intersection of Belair Road and Sheldon Avenue, Officer Galligan activated his emergency lights and sirens.  ECF 55 at 5.  Officer Galligan's body camera footage indicates that he had followed the blue Acura for approximately one minute and fifteen seconds before activating his emergency equipment.  *See* Government's Exhibit 4 at 0:00–1:15.

The driver of the Acura, later identified as defendant Charvez Brooks, did not stop in response to Officer Galligan's lights and siren. ECF 55 at 5. Instead, he attempted to flee. *Id.* Officer Galligan then stated over the police radio: "Northeast, can I get Fox?[4] I've got a blue Acura TL taking off on me." Government's Exhibit 4 at 1:18–1:22. According to Officer Galligan, defendant drove recklessly, was speeding, ran multiple red lights, and nearly collided with several vehicles. ECF 55 at 5; ECF 72 at 7. Officer Galligan pursued defendant northbound on Belair Road, in the direction of Baltimore County. ECF 55 at 5; ECF 72 at 7.

During the pursuit, two people standing in the road near the intersection of Belair Road and Overlea Avenue "flagged down" Officer Kristopher Hayes, who had joined in the pursuit of the blue Acura. *See* Government's Exhibit 8 (video from Officer Hayes's body-worn camera). Officer Galligan heard over the radio that a gun had been thrown out of the window of the car he was pursuing. *See* Government's Exhibit 4 at 5:50.

Officer Hayes's body camera recorded his interaction with the individuals who witnessed the gun being thrown from the car. *See* Government's Exhibit 8. The witnesses informed Officer Hayes that they had observed a gun thrown from the passenger side of a car pursued by the police. ECF 55 at 5; Government's Exhibit 8 at 2:55–3:15; 5:15–5:25; 6:40–6:50; 8:50–9:20. According to one of the witnesses, the car from which the gun was thrown was a black or blue Acura TLX. Government's Exhibit 8 at 9:20–9:45.

The handgun landed in a parking lot adjacent to Belair Road. *See* Government's Exhibit 8. The two individuals remained at the scene but did not touch the gun. Officer Hayes and other officers responded to the parking lot and recovered the firearm. *Id.*

---

4 The Court believes that "Fox" is a reference to BPD's helicopter unit, known as "Foxtrot."

In the meantime, Officer Galligan continued to pursue defendant northbound on Belair Road. ECF 72 at 8. Because defendant was approaching Baltimore County, Officer Kreiter, who was also in pursuit of the defendant, requested assistance from the Baltimore County Police Department. *Id.*

Defendant eventually turned left on Belair Road and entered a residential area. *Id.* He finally stopped his car at Plantagenet Circle, near Seven Courts Drive, in Parkville, Maryland. *Id.*; ECF 55 at 5. The officers drew their guns and ordered defendant to exit the vehicle. *See* Government's Exhibit 4 at 9:25–11:00. Defendant was taken into custody. *See id.*; ECF 72 at 8; ECF 55 at 5.

Photographs introduced into evidence indicate that the vehicle the defendant was driving was a blue Acura with a chrome grill, chrome markings on the front bumper, and tinted windows. Of import, it had no front license plate. Government's Exhibit 5; Government's Exhibit 6. Moreover, the vehicle closely resembled the vehicle shown in the BOLO Notice. *See* Government's Exhibit 1.

The pursuit of defendant lasted about eight minutes. *See* Government's Exhibit 4. During the pursuit, defendant and the officers traveled about 7.4 miles. Government's Exhibit 3. Officer Galligan issued eight traffic citations to defendant as follows: reckless driving, in violation of Md. Code (2020 Repl. Vol., 2023 Supp.) § 21-901.1(a) of the Transportation Article ("Transp.") (ECF 72-3 at 1); negligent driving, in violation of Transp. § 21-901.1(b) (ECF 72-3 at 2); unsafe lane changing, in violation of Transp. § 21-309(b) (ECF 72-3 at 3); failure to drive right of center, in violation of Transp. § 21-301(a) (ECF 72-3 at 4); failure to attach front and rear plates, in violation of Transp. § 13-411(a) (ECF 72-3 at 5); driving at a speed greater than reasonable, in violation of Transp. § 21-801(a) (ECF 72-3 at 6); failure to obey a traffic device, in violation of Transp. § 21-

201(a)(1) (ECF 72-3 at 7); and failure to stop at a steady circular red signal, in violation of Transp. § 21-202(h)(1) (ECF 72-3 at 8).  Government's Exhibit 7.

After defendant's arrest, he was transported to the Homicide Unit at BPD headquarters for questioning.  ECF 72 at 9; ECF 55 at 5.  The interview, which was conducted by Detective Shawn Reichenberg and Detective Ryan O'Connor, was recorded by video.  *See* Government's Exhibit 13; Government's Exhibit 15.  In addition, a transcript was prepared.  Government's Exhibit 14. The interview began at 12:56 p.m. (*see id.* at 2:2–3)[5] and lasted about 26 minutes.

The video reflects that defendant was wearing handcuffs when he entered the interview room.  *See* Government's Exhibit 13.  However, after defendant entered the interview room, Detective Reichenberg removed the handcuffs.  *See id.*  Detective Reichenberg also asked defendant whether his leg shackles were too tight.  Government's Exhibit 14 at 2:18–24. Defendant responded that they were not too tight.  *Id.* at 2:24.  Detective Reichenberg also offered defendant water, and defendant said: "Yeah, that'll work."  *Id.* at 3:11–12.  Detective Reichenberg left the interview room at 1:04 p.m.  *Id.* at 3:16–17.  Defendant was able to move around in the interview room.

At 1:51 p.m., an officer entered the interview room to provide defendant with a water bottle.  *Id.* at 3:18–20.  Defendant then stated:  "I just wanted to ask, can he come back in and speak with me?"  *Id.* at 3:21–22.

Detective Reichenberg and Detective O'Connor entered the interview room at 2:07 p.m. *Id.* at 4:2–3. They wore plain clothes and were not wearing their firearms.  Detective O'Connor smelled the odor of marijuana and asked defendant whether he had "been smoking weed" or had

---

[5] When citing to the transcript, I provide the page and line numbers, separated by a colon. For example, a citation to page one, lines two through twelve, appears as "1:2–12."

marijuana in his possession. *Id.* at 4:7–8. Defendant replied: "I smoked it, yeah." *Id.* at 4:9. Detective Reichenberg then stated: "Yeah. He said he—the officer checked him, but he said he smoked it earlier." *Id.* at 4:10–11. Defendant had been in custody since about 12:00 p.m.

After this exchange, Detective Reichenberg introduced himself and Detective O'Connor. *Id.* at 4:12–13. Detective Reichenberg told defendant that defendant could talk to the detectives if he wanted to do so. *Id.* at 4:14. Detective Reichenberg then reviewed a written rights form with defendant. Government's Exhibit 16; Government's Exhibit 14 at 4:17 to 6:12; *see Miranda v. Arizona*, 384 U.S. 436 (1966). In particular, Detective Reichenberg read each right aloud and, after reading each right, asked defendant whether he understood. Government's Exhibit 14 at 4:17 to 6:12. For example, defendant was advised that, even if he agreed to answer questions, he could "stop at any time . . . and no further questions will be asked . . . ." *Id.* at 5:15–16. Defendant acknowledged that he understood each right that was read to him. *Id.*

Thereafter, Detective Reichenberg reviewed with defendant the following statement on the form: "I have been advised of and understand my rights. I freely and voluntarily waive my rights and agree to talk with the police without having an attorney present." *Id.* at 5:24 to 6:2. Detective Reichenberg then asked Brooks: "Do you want to talk to us?" *Id.* at 6:1–2. Defendant responded: "I mean, I do want to know why I'm in homicide." *Id.* at 6:3–4. Detective Reichenberg answered: "Okay. So in order for us to go any—again, like you said, we can stop at any time. After—after I give you the answer, you can stop." *Id.* at 6:5–7. Thereafter, defendant signed the written *Miranda* waiver form. Government's Exhibit 16; ECF 72-4. The form indicates that it was executed at "1409 hrs." *Id.*

As noted, an interview of approximately 26 minutes in length ensued. Government's Exhibit 14 at 41:5–6. Detective Reichenberg began the interview by obtaining personal

information from defendant. *Id.* at 6:14 to 16:18. When Detective Reichenberg asked defendant who owned the car that defendant was driving, defendant stated: "It's . . . my baby mother car." *Id.* at 12:14. Detective Reichenberg asked defendant for the address of the car's owner. *Id.* at 13:7–9. Defendant responded: "I don't want to give — too much information." *Id.* at 13:4, 6. Detective Reichenberg explained: "So the reason I'm asking is because that may help your situation right now." *Id.* at 13:7–9. Defendant then said: "I want to know why I'm here." *Id.* at 13:18.

Reichenberg indicated that he was asking because the car is registered to the baby's mother, and disclosure "could very well help [defendant's] situation." *Id.* at 14:1–3. He also said that the detectives did not care if, for example, defendant was using the car without permission of the owner. *Id.* at 14:13. In particular, the detective said: "I'm not gonna call your baby's mother and put you out there or anything like that . . . . So . . . it's up to you . . . ." *Id.* at 14:17–21. Brooks responded: "I want to get to the point . . . where, like, we finding out what's going on, why I'm sitting right here . . . in homicide." *Id.* 14:25 to 15:5. But, he did tell the detectives that the car owner lived on "Brendan Avenue." *Id.* at 15:14.

Detective Reichenberg also asked defendant "what . . . the last time [he] drove that car was." *Id.* at 17:1–2. Defendant responded that the last time he drove the car was "about a month ago." *Id.* at 17:3. Thereafter, Detective Reichenberg explained that a car matching the description of the car driven by defendant was suspected of involvement in a police shooting. *Id.* at 17:4–25.

Detective Reichenberg also informed defendant that he would be charged with an offense related to his possession of the handgun, stating, *id.* at 22:10–16, 19–20:

> I will tell you this, you're under—you are being charged with a handgun. It's a misdemeanor. All you're being charged with is a handgun violation that I know of right now . . . and I guess, a little bit of weed.

9

Thereafter, the detectives asked several questions about the gun recovered from the parking lot. *See, e.g., id.* at 24:15 to 28:1. In particular, Detective Reichenberg asked: "Why do you have a gun in the car? Just because it's Baltimore?" *Id.* at 24:11–13. Defendant replied: "Yeah. We— you all know where we live at." *Id.* at 24:14–15. Detective O'Connor later asked: "What kind of gun was it real quick?" *Id.* at 26:15. Defendant responded with a single word: "What?" *Id.* at 26:16. Later, Detective Reichenberg stated, *id.* at 27:14–16:

> So this is the gun that you threw out the passenger window. Right. They're gonna process it. They're gonna photograph it. They're gonna DNA it.

Defendant then stated, *id.* at 27:17–18 : "You [inaudible] give somebody time for that little ass gun[?]"

After further questioning pertaining to defendant's whereabouts on the day of Sergeant Carrington's shooting, the interview concluded at 2:33 p.m. *See id.* at 41:5–6.

Defendant never asked to terminate the interview. Nor did he request to speak with an attorney.

On August 12, 2019, a judge in the District Court of Maryland for Baltimore City signed a search warrant authorizing the search of defendant's Acura. ECF 55 at 2. After executing the warrant, officers recovered three cell phones, various paperwork, and a small container with a small amount of suspected marijuana. *Id.* at 8; ECF 72 at 11. Officers also obtained latent fingerprints and swabbed portions of the car for DNA. ECF 55 at 8; ECF 72 at 11. In addition, the officers photographed the vehicle before and after the search. ECF 72 at 11.

## II.    Contentions

Defendant contends that "the initial police pursuit of his vehicle was a warrantless seizure without probable cause." ECF 53 at 3. According to defendant, it follows that the evidence

obtained as a result of the pursuit—namely, the firearm and the post-arrest statements—must be suppressed as the fruit of an unlawful seizure. *Id.* at 3–6.

In addition, defendant claims: "Any statements, admissions, or confessions" made by defendant "were obtained in violation of [his] privilege against self-incrimination, his right to counsel as guaranteed by the Fifth and Sixth Amendments to the United States Constitution, and the Supreme Court's holding in *Miranda v. Arizona*, 384 U.S. 436 (1966)." ECF 52, ¶ 3. Defendant also suggests that his statements were involuntary. *Id.* ¶ 5. In particular, according to defendant, he made the statements while under the influence of marijuana and a result of the detectives' deceptive suggestion that they were not investigating his possession of the firearm.

In its Opposition, the government argues, first, that defendant had no reasonable expectation of privacy in the parking lot where officers discovered the firearm. ECF 72 at 38. Moreover, the government argues that defendant did not have a reasonable expectation of privacy in the firearm itself, because he abandoned it in the parking lot. *Id.* As a result, the government asserts that defendant cannot claim the protections of the Fourth Amendment with respect to the firearm. *Id.*

The government argues, second, that defendant had not been seized at the time he abandoned the firearm. *Id.* at 39–40. The government acknowledges that Officer Galligan's "activat[ion] [of] his emergency lights and sirens" was "unquestionably a show of authority." *Id.* at 39. But, according to the government, defendant "did not submit to that show of authority." *Id.* "Instead," the government states, defendant "took the police on a high speed, dangerous pursuit covering 7.4 miles in a little more than 8 minutes." *Id.* at 39–40. In the government's view, "[i]t was not until the Defendant finally stopped his car—in a residential area in Baltimore County— that he submitted to law enforcement authority." *Id.* at 40. And, the government asserts that, "well

before he stopped his car, the Defendant threw [the] firearm out of the window of his car." *Id.*
The government concludes:  "Because the Defendant did not submit to the officers' show of
authority at the time he threw the firearm, a seizure had not occurred and the Fourth Amendment
was not implicated." *Id.*

Third, the government argues that Officer Galligan's initial pursuit of defendant was
justified by reasonable suspicion of wrongdoing.  *Id.* at 40–43.  In particular, according to the
government, the stop was justified because defendant's blue Acura matched the description of the
car suspected in relation to the shooting of Sergeant Carrington; defendant's "vehicle likely had
illegally tinted windows," in violation of Transp. § 22-406(i)(1)(i); and the vehicle "was not
displaying a front license," in violation of Transp. § 13-411(a).  *Id.* at 41–43.  According to the
government, "[e]ach of those observations provided independent reasons for the traffic stop."  *Id.*
at 41.  Moreover, the government contends that defendant's reckless driving during his attempt to
flee from Officer Galligan provided an additional basis for the stop.  *Id.* at 42.

With respect to defendant's assertion that his post-arrest statements were obtained in
violation of *Miranda*, 384 U.S. 436, the government argues that defendant was advised of his rights
and knowingly and voluntarily waived them before the detectives began to question him.  *Id.* at
47–49.  In particular, the government asserts that defendant "waived his rights by signing a waiver
of rights form," which the government has submitted as an exhibit to its Opposition.  *Id.* at 47; *see*
Government's Exhibit 16; ECF 72-4.  According to the government, "[i]t was only" after defendant
signed the waiver form "that the officers began to ask him substantive questions about the case."
ECF 72 at 47.

Finally, with respect to defendant's suggestion that his statements were involuntary, the
government maintains that there is no evidence that defendant was subject to coercion or duress.

*Id.* at 48.  According to the government, defendant's handcuffs were removed and he was provided with a bottle of water.  *Id.*   In addition, he was able to move around the room while waiting for the officers.  *Id.*  The officers were in plain clothes and did not have their firearms with them.  *Id.* They explained to the defendant why they wanted to question him and made no promises or threats. *Id.* at 48–49.  And, according to the government, the detectives were "cordial," "pleasant," "calm[,] and friendly throughout the interview"; "[a]t various points in the conversation, the Defendant and detectives laughed and joked around"; and "[a]t the end of the short, approximately 25-minute . . . interview, the Defendant shook hands with the detectives."  *Id.* at 48.

### III.    Discussion

### A.

As noted, defendant argues that he was seized when Officer Galligan began "the initial police pursuit of his vehicle."  ECF 53 at 3.  According to defendant, this "initial police pursuit" was unlawful, and all evidence obtained as a result of this unlawful seizure—in particular, the firearm and his post-arrest statements—must be suppressed.

In contrast, the government contends that no seizure occurred until defendant pulled over and surrendered to law enforcement.  ECF 72 at 39–40.  In the government's view, defendant had not been seized at the time he threw the gun out of the car window.  *Id.*  The government also argues that defendant forfeited any reasonable expectation of privacy in the firearm by abandoning it in a public parking lot.  *See id.* at 36–38.

Notably, "a person does not voluntarily abandon property when the abandonment results from police misconduct . . . ."  *United States v. Leshuk*, 65 F.3d 1105, 1111 (1995) (citing *United States v. Lara*, 638 F.2d 892, 895 (5th Cir. 1981)).  Therefore, before addressing the government's argument concerning abandonment, the Court must determine whether defendant was seized at the

time he allegedly discarded the firearm.  And, if defendant was seized at the time he discarded the firearm, the Court must then determine whether that seizure was supported by reasonable, articulable suspicion of illegal conduct by defendant.  If defendant was not seized when he discarded the firearm—or, if he was seized, but the seizure was lawful—the Court would then consider whether defendant forfeited his Fourth Amendment interest in the firearm by discarding it in a public parking lot.

For the reasons that follow, I conclude that defendant was not seized at the time he discarded the firearm.  Instead, he was seized only when he pulled over at Plantagenet Circle in Baltimore County.  But, even if defendant was seized before he discarded the firearm, the seizure was lawful, because it was justified by reasonable, articulable suspicion.  Moreover, I conclude that defendant forfeited his Fourth Amendment interest in the firearm by discarding it onto a parking lot accessible to the public.

Therefore, neither defendant's arrest nor the officers' recovery of the firearm was preceded by any illegality on the part of the police.  It follows that there is no basis to suppress the firearm or defendant's post-arrest statements as the fruit of an unlawful seizure.

### 1.   When Was Defendant Seized?

The Fourth Amendment to the Constitution guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures."  However, this guarantee "does not extend to all police-citizen encounters."  *United States v. Jones*, 678 F.3d 293, 298–99 (4th Cir. 2012).  "As a general matter, law enforcement officers do not seize individuals 'merely by approaching [them] on the street or in other public places and putting questions to them.'"  *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015) (quoting *United States v. Drayton*, 536 U.S. 194, 200 (2002)).  Rather, "[a] seizure, as understood under the Fourth Amendment, occurs '[o]nly

when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *United States v. Peters*, 60 F.4th 855, 862 (4th Cir. 2023) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

In determining whether a seizure has been effected by a show of authority, a court considers "whether, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Peters*, 60 F.4th at 862 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). In *United States v. Black*, 707 F.3d 531, 537–38 (4th Cir. 2013), the Fourth Circuit specified that, "[w]hen establishing whether a reasonable person would feel free to leave," a court should consider, *inter alia*:

> (i) the number of police officers present; (ii) whether the police officers were in uniform; (iii) whether the police officers displayed their weapons; (iv) whether they touched the defendant or made any attempt to physically block his departure or restrain his movement; (v) the use of language or tone of voice indicating that compliance with the officer's request might be compelled; (vi) whether the officers informed the defendant that they suspected him of illegal activity rather than treating the encounter as routine in nature; and (vii) whether, if the officer requested from the defendant . . . some form of official identification, the officer promptly returned it.

The fact that a reasonable person would not feel free to terminate an encounter with law enforcement is "a *necessary*, but not a *sufficient*, condition" of a "seizure effected through a 'show of authority.'" *California v. Hodari D.*, 499 U.S. 621, 626 (1991). In particular, a seizure accomplished by show of authority requires both an assertion of authority and "*submission* to the assertion of authority." *Id.*; *see also Stover*, 808 F.3d at 995–96. In other words, "'[w]ithout actual submission' to the police, 'there is at most an attempted seizure,' which is not subject to Fourth Amendment protection." *Stover*, 808 F.3d at 996 (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007). As a result, a "defendant who flees the police in response to an assertion of authority has not been seized, and . . . his Fourth Amendment rights are not implicated." *United States v.*

*Brown*, 401 F.3d 588, 594 (4th Cir. 2005); *see also United States v. Baker*, 326 F. App'x 213, 215 (4th Cir. 2009).

However, "[a]s with the 'show of authority' analysis, determining what constitutes 'submission' can be a difficult, fact-intensive inquiry." *Stover*, 808 F.3d at 996. "'[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away.'" *Id.* (quoting *Brendlin*, 551 U.S. at 262).

Officer Galligan's activation of his emergency equipment after positioning his police car behind defendant's vehicle was undoubtedly a show of authority. But, by itself, this show of authority was not sufficient to constitute a seizure under the Fourth Amendment. *See Hodari D.*, 499 U.S. at 626; *Stover*, 808 F.3d at 996. It was also necessary for defendant to *submit* to Officer Galligan's show of authority. *Stover*, 808 F.3d at 996 (stating that, without actual submission, "there is at most an attempted seizure"). And, it is clear from the facts presented to the Court that defendant did not submit to Officer Galligan's show of authority until he stopped his car in Baltimore County, more than seven miles from where the pursuit began.

In particular, the evidence shows that, after Officer Galligan activated his emergency equipment, defendant attempted to flee. Government's Exhibit 4. A pursuit followed that covered over seven miles and lasted approximately eight minutes. *See id*. During the pursuit, defendant tossed his gun from his car. *See* Government's Exhibit 4 at 5:50; Government's Exhibit 8. Again, it was only when defendant stopped his car that he submitted to the officers' show of authority. Only then did a seizure occur within the meaning of the Fourth Amendment.

Therefore, I conclude that defendant had not been seized when, during the pursuit, he allegedly threw the firearm out of the passenger window of his car and onto a nearby parking lot.

### 2.  Assuming that Defendant Was Seized When Officer Galligan Began the Pursuit, Was the Seizure Supported by Reasonable Suspicion?

The government argues that, even if Officer Galligan's activation of his emergency equipment amounted to a seizure under the Fourth Amendment, that seizure was nonetheless justified by the officer's reasonable, articulable suspicion that defendant had committed or was committing a crime.  ECF 72 at 40–43.  Therefore, according to the government, defendant's surrender of the firearm could not have been the fruit of an unlawful seizure.  *Id.*

For the reasons that follow, I agree with the government that Officer Galligan's attempt to stop defendant's car was justified by reasonable, articulable suspicion of wrongdoing.

In general, a traffic stop begins when a car "is pulled over for investigation of a traffic violation."  *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).  It is well settled that when a police officer stops an automobile and detains the occupant, the stop constitutes a seizure that implicates the Fourth Amendment.  *Kansas v. Glover*, 589 U.S. ___, 140 S. Ct. 1183, 1187 (2020); *United States v. Cloud*, 994 F.3d 233, 241 (4th Cir. 2021); *United States v. Drakeford*, 992 F.3d 255, 262 (4th Cir. 2021); *United States v. Curry*, 965 F.3d 313, 319 (4th Cir. 2020) (en banc); *see, e.g., Brendlin*, 551 U.S. at 255; *Wren v. United States*, 517 U.S. 806, 809–10 (1996); *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Feliciana*, 974 F.3d 519, 522 (4th Cir. 2020); *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018); *United States v. Sowards*, 690 F.3d 583, 588–89 (4th Cir. 2012); *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2012); *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011), *abrogated in part on other grounds by Rodriguez v. United States*, 575 U.S. 348 (2015).

By its plain text, the Fourth Amendment "does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *see Illinois v. Rodriguez*, 497 U.S. 177, 183–84 (1990); *Sharpe*, 470 U.S. at

682; *Mendenhall*, 446 U.S. at 551.   Therefore, "'the ultimate touchstone of the Fourth

Amendment is reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014) (quoting *Brigham*

*City v. Stuart*, 547 U.S. 398, 403 (2006) (internal quotation marks omitted)); *see also Fernandez*

*v. California*, 571 U.S. 292, 298 (2014); *Maryland v. Wilson*, 519 U.S. 408, 411 (1997); *Jimeno*,

500 U.S. at 250; *United States v. Aigbekaen*, 943 F.3d 713, 719–20 (4th Cir. 2019).

The "test of reasonableness under the Fourth Amendment is an objective one." *Los Angeles*

*County v. Rettele*, 550 U.S. 609, 614 (2007) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

Reasonableness is determined by balancing "the intrusion on the individual's Fourth Amendment

interests against [the] promotion of legitimate governmental interests."  *Maryland v. Buie*, 494

U.S. 325, 331 (1990).  As the Supreme Court explained in *Pennsylvania v. Mimms*, 434 U.S. 106,

109 (1977) (per curiam): "Reasonableness, of course, depends 'on a balance between the public

interest and the individual's right to personal security free from arbitrary interference by law

officers.'" (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)); *see United States*

*v. Sokolow*, 490 U.S. 1, 9 (1989); *see also United States v. Lyles*, 910 F.3d 787, 796 (4th Cir. 2018)

("The magnitude of the intrusion relative to the seriousness of any offense 'is of central relevance

to determining reasonableness[.]'") (quoting *Maryland v. King*, 569 U.S. 435, 446 (2013)).

In *Santos v. Frederick County Bd. of Comm'rs*, 725 F.3d 451 (4th Cir. 2013), the Fourth

Circuit summarized "three categories of police-citizen encounters," *id.* at 460–61:

> First, "consensual" encounters, the least intrusive type of police-citizen interaction,
> do not constitute seizures and, therefore, do not implicate Fourth Amendment
> protections. *Florida v. Bostick*, 501 U.S. 429, 434[] (1991). Second, brief
> investigative detentions—commonly referred to as "*Terry* stops"—require
> reasonable, articulable suspicion of criminal activity. *Terry*, 392 U.S. at 21 [].
> Finally, arrests, the most intrusive type of police-citizen encounter, must be
> supported by probable cause. *Devenpeck v. Alford*, 543 U.S. 146, 152[] (2006).

> A police-citizen encounter rises to the level of a Fourth Amendment seizure
> when "the officer, by means of physical force or show of authority, has in some

way restrained the liberty of a citizen . . . ." *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012) (quoting *Terry*, 392 U.S. at 19 n.16 [ ]). This inquiry is objective, [*United States v.*] *Weaver*, 282 F.3d [302, 309 (4th Cir. 2002)], asking whether "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Jones*, 678 F.3d at 299 (quoting *Mendenhall*, 446 U.S. at 553 [ ]). An encounter generally remains consensual when, for example, police officers engage an individual in routine questioning in a public place. *United States v. Gray*, 883 F.2d 320, 323 (1989); *see also Bostick*, 501 U.S. at 434[ ] ("[M]ere police questioning does not constitute a seizure.").

Generally, warrantless seizures and searches are per se unreasonable, subject only to a few well-established exceptions. *See Katz v. United States*, 389 U.S. 347, 357 (1967); *see also Riley*, 573 U.S. at 382 (stating that, "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement"); *Kentucky v. King*, 563 U.S. 452, 459–60 (2011). The government bears the burden of justifying a warrantless seizure. *Feliciana*, 974 F.3d at 523; *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018); *United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013).

What has become known as the "*Terry* stop and frisk" is one of the exceptions to the warrant requirement. *See Terry v. Ohio*, 392 U.S. 1 (1968). The seminal case of *Terry v. Ohio* permits a police officer to stop and temporarily detain an individual for investigative purposes, without violating the Fourth Amendment's prohibition against unreasonable searches and seizures, so long as the officer has a reasonable, articulable suspicion, based on specific facts, that criminal activity is afoot. *Id.* at 30; *see Peters*, 60 F.4th at 862; *Feliciana*, 974 F.3d at 522; *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Reid v. Georgia*, 448 U.S. 438, 440 (1980); *United States v. Slocumb*, 804 F.3d 677, 681 (4th Cir. 2015); *United States v. Massenburg*, 654 F.3d 480,

485 (4th Cir. 2011). The purpose of a *Terry* stop is investigative, that is, to verify or to dispel the officer's suspicion. *Terry*, 392 U.S. at 22, 30.[6]

The Supreme Court has said that "the usual traffic stop is more analogous to a so-called 'Terry stop,' . . . than to a formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *see Rodriguez*, 575 U.S. at 354; *Knowles v. Iowa*, 525 U.S. 113, 117 (1998). Fourth Circuit law is to the same effect. *See United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015) (A vehicle stop is "more akin to an investigative detention than a custodial arrest"); *see also United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019). However, because a traffic stop is a seizure, it is subject to the Fourth Amendment's reasonableness requirement. *Wren*, 517 U.S. at 810; *Prouse*, 440 U.S. at 653. "[T]o pass constitutional muster," the officer must have "a constitutionally adequate basis" for it. *United States v. White*, 836 F.3d 437, 440–41 (4th Cir. 2016), *abrogated on other grounds by United States v. Stitt*, 586 U.S. ___ , 139 S. Ct. 399 (2018).

Because a traffic stop is more akin to an investigative detention than a custodial arrest, the Supreme Court has adopted the dual inquiry standard articulated in *Terry*, 392 U.S. 1, to assess the constitutionality of the traffic stop. *See Johnson*, 555 U.S. at 330–31; *Bernard*, 927 F.3d at 805; *Bowman*, 884 F.3d at 209; *United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016); *Williams*, 808 F.3d at 245; *United States v. Guijon-Ortiz*, 660 F.3d 757, 764 (4th Cir. 2011). Under the dual inquiry standard, the court examines "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Sharpe*, 470 U.S. at 682; *see also Bernard*, 927 F.3d at 805; *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017); *Williams*, 808 F.3d at 245; *Guijon-Ortiz,* 660 F.3d at 764.

---

[6] With respect to a frisk, the police officer must have a reasonable suspicion that the suspect is both armed and dangerous. *Johnson*, 555 U.S. at 327. But, certainty is not required. *Terry*, 392 U.S. at 27.

I focus here on whether the police conduct was justified at its inception. Reasonable suspicion requires "'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Glover*, 140 S. Ct. at 1187 (citation omitted); *see Ornelas v. United States*, 517 U.S. 690, 696 (1996) (stating that reasonable suspicion is "a particularized and objective basis for suspecting the person stopped of criminal activity. . . ."); *see also Wingate v. Fulford*, 987 F.3d 299, 305 (4th Cir. 2021); *Feliciana*, 974 F.3d at 523; *Williams*, 808 F.3d at 246; *Black,* 707 F.3d at 539; *Massenburg*, 654 F.3d at 486; *United States v. Griffin,* 589 F.3d 148, 152 (4th Cir. 2009). But, it "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," although a "minimal level of objective justification [is required] for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *see Glover*, 140 S. Ct. at 1188; *United States v. Critchfield*, 81 F.4th 390 F.4th 393 (4th Cir. 2023); *United States v. Lawing*, 703 F. 3d 229, 236 (4th Cir. 2012); *United States v. Christmas*, 222 F.3d 141, 143 (4th Cir. 2000).

To be sure, the matter of reasonable, articulable suspicion is sometimes elusive. The Supreme Court has acknowledged the difficulty in defining the term "articulable suspicion." *Ornelas*, 517 U.S. at 699–700. Moreover, the Court has recognized that the standard is "'not readily, or even usefully, reduced to a neat set of legal rules.'" *Id.* at 695–96. However, "the detaining officer [must] '. . . either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance.'" *Williams*, 808 F.3d at 246 (citation omitted).

Notably, reasonable suspicion is an "objective standard." *United States v. Johnson*, 734 F.3d 270, 275 (4th Cir. 2014). Therefore, the officer's subjective state of mind is not considered.

*United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013), *cert. denied*, 572 U.S. 1009 (2014); *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011).

The standard "'depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act.'" *Glover*, 140 S. Ct. at 1188 (citations omitted) (emphasis added in *Glover*).  Moreover, officers must be permitted to make "'commonsense judgments and inferences about human behavior.'"  *Id.* (citation omitted); *see Navarette v. California*, 572 U.S. 393, 404 (2014).  Therefore, in assessing reasonable suspicion, courts must "give due weight to common sense judgments reached by officers in light of their experience and training."  *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004); *see also Glover*, 140 S. Ct. at 1189; *Critchfield*, 81 F.4th at 393; *Feliciana*, 974 F.3d at 525; *United States v. McBride*, 676 F.3d 385 (4th Cir. 2012); *Sowards*, 690 F.3d at 587–88; *United States v. Johnson*, 599 F.3d 339, 343 (4th Cir. 2010); *United States v. Branch*, 537 F.3d 328, 33–37 (4th Cir. 2008), *cert. denied*, 555 U.S. 1118 (2009).

As the Fourth Circuit has said, the court "must not discount the officers' experience and training 'to detect the nefarious in the mundane.'"  *Critchfield*, 81 F.4th at 395 (quoting *United States v. McCoy*, 513 F.3d 405, 415 (4th Cir. 2008)).  However, a mere "'hunch'" or "'inchoate and unparticularized suspicion'" is not enough.  *Wardlow*, 528 U.S. at 124 (citation omitted); *see Critchfield*, 81 F.4th at 393; *United States v. Gist-Davis*, 41 F.4th 259, 264 (4th Cir. 2022).  "The suspicion must be articulable . . . ."  *Critchfield*, 81 F.4th at 393.  But, "'[t]o be reasonable is not to be perfect.'"  *Glover*, 140 S. Ct. at 1188 (citation omitted).

In making this assessment, a court considers the totality of circumstances.  *See Arvizu*, 534 U.S. at 273; *Peters*, 60 F.4th at 864; *Cloud*, 994 F.3d at 242.  "A host of factors can contribute to a basis for reasonable suspicion, including the context of the stop, the crime rate in the area, and

the nervous or evasive behavior of the suspect." *George*, 732 F.3d at 299 (citing *Wardlow*, 528 U.S. at 124). And, "[f]acts innocent in themselves may together amount to reasonable suspicion." *United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020); *see Sokolow*, 490 U.S. at 9–10.

The fact that a vehicle is being driven contrary to the laws governing the operation of motor vehicles generally gives rise to probable cause or reasonable, articulable suspicion of a crime. *Prouse*, 440 U.S. at 650; *Whren,* 517 U.S. at 817–18. In *Bernard*, 927 F.3d at 805, the Fourth Circuit reiterated: "'When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle.'" (quoting *United States v. Williams*, 740 F.3d 308, 312 (4th Cir. 2014)). And, "'once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.'" *Ohio v. Robinette*, 519 U.S. 33, 38–39 (1996) (quoting *Mimms*, 434 U.S. at 111 n.6).[7] The stop of the driver ordinarily does not violate the Constitution, so long as the stop is no longer than necessary to perform the traditional incidents of a routine traffic stop. *Rodriguez*, 575 U.S. at 350; *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *Prouse*, 440 U.S. at 650; *Branch*, 537 F.3d at 335.

Notably, "the Government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up contraband." *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016) (citation and internal quotation marks omitted); *see Peters*, 60 F.4th at 864. And, as the Fourth Circuit has said, "[i]t is the *police officer* who 'must be able to point to specific and articulable facts' — not a party's brief." *Peters*, 60 F.4th at 864 (citing *Terry*, 392 U.S. at 21) (emphasis in *Peters*).

---

[7] A passenger may also be required to exit a vehicle during a routine traffic stop. *Wilson*, 519 U.S. at 414–15.

23

When Officer Galligan first saw defendant's car, both he and defendant were on Belair Road.  Officer Galligan noticed immediately that defendant's vehicle matched the description of a car that was believed to be linked to a police officer shooting in the area just two days earlier. And, as Officer Galligan was facing in the direction of oncoming traffic, he observed that the vehicle operated by defendant was missing a front license plate.  Of import, the vehicle linked to the shooting also lacked a front tag.  Moreover, it is unlawful in Maryland to operate a passenger car without a front license tag.  *See* Transp. §§ 13-410(a)(1), 13-411(a).

As a result of what Officer Galligan saw, he activated his emergency lights to make a U turn on Belair Road and then turned them off.  He proceeded to follow defendant's Acura.  More than a minute later, while positioned behind defendant's car, Officer Galligan activated his lights and siren, which signaled to the defendant to stop.  Defendant failed to comply.

"[A]n investigatory stop of a vehicle can be justified on a reasonable suspicion of illegal activity instead of probable cause."  *United States v. Harris*, 39 F.3d 1262, 1269 (4th Cir. 1994). I readily conclude that Officer Galligan's activation of his emergency equipment in an attempt to stop defendant's car was justified by reasonable suspicion of illegal activity.

In particular, as stated, Officer Galligan noticed defendant's vehicle just two days after Sergeant Carrington's shooting, in an area in close proximity to the location of that crime.  And, the vehicle driven by defendant closely resembled the make, model, and color of the vehicle tied to Carrington's shooting, for which an alert had been issued.  Indeed, Officer Galligan had put a photograph of the suspect vehicle as the background on his phone. Moreover, defendant's car, like the car believed to have been involved in Sergeant Carrington's shooting, was missing its front license plate and had tinted windows.  Indeed, the photographs of the two cars are striking in depicting the similarity of their appearance.  *Compare* Government's Exhibit 1 (BOLO Notice

24

with images of suspect vehicle) *with* Government's Exhibit 5; Government's Exhibit 6 (images of car driven by defendant).

In my view, these facts provided a legitimate basis for Officer Galligan's attempted stop of defendant's car. *See Torres v. Ball*, No. 21-6447, 2023 WL 2966035, at *7 (4th Cir. Apr. 17, 2023) (finding investigatory stop justified when "the make, model, color, and a specific feature— dark tinted windows—of" the stopped vehicle matched those of a suspected vehicle).

Apart from the similarity of defendant's vehicle to the vehicle depicted in the BOLO, the stop was also justified by Officer Galligan's reasonable suspicion that defendant's vehicle lacked a front license plate, as required by Maryland law. Transp. § 13-410(a)(1) provides for the issuance of two license plates to all vehicles, except motorcycles, tractors, trailers, historic vehicles, and "street rods." And, Transp. § 13-411(a) states: "On a vehicle for which two registration plates are required, one plate shall be attached on the front and the other on the rear of the vehicle." Officer Galligan was facing defendant's vehicle when he first saw it, and he immediately noticed the missing license plate. *See* Government's Exhibit 5. In my view, the absence of a front license plate on defendant's car, by itself, provided a legitimate basis for Officer Galligan's attempted stop.

Finally, the stop was justified by Officer Galligan's reasonable suspicion that, by speeding away from Officer Galligan in the 4100 block of Belair Road—*before* Officer Galligan activated his emergency equipment—defendant was driving at a speed greater than reasonable, in violation of Transp. § 21-801(a), and was driving recklessly or negligently, in violation of Transp. § 21-901.1. *See* ECF 72-3 at 1 (citation for "Reckless Driving," in violation of Transp. § 21-901(a)); ECF 72-3 at 2 (citation for "Negligent Driving," in violation of Transp. § 21-901.1(b)); ECF 72-3 at 6 (citation for "Speed Greater Than Reasonable," in violation of Transp. § 21-801(a)).

25

In contrast to an investigative stop, which may be justified by reasonable suspicion of illegality, a "warrantless arrest is reasonable [only] if the officer has probable cause to believe that the suspect committed a crime in the officer's presence." *District of Columbia v. Wesby*, 583 U.S. 48, 56 (2018) (citing *Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001)). Probable cause is "'defined in terms of facts and circumstances sufficient to warrant a prudent [person] in believing that the suspect had committed or was committing an offense.'" *Henderson v. Simms*, 223 F.3d 267, 271 (4th Cir. 2000) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)). "While probable cause requires more than 'bare suspicion,' it requires less than that evidence necessary to convict." *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). "In assessing whether probable cause exists, [a court] must examine the totality of the circumstances." *Wadkins v. Arnold*, 214 F.3d 535, 539 (4th Cir. 2000); *see also United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011); *Wesby*, 583 U.S. at 57.

In *Maryland v. Pringle*, 540 U.S. 366 (2003), the Supreme Court explained, *id.* at 370–71 (citations and internal quotation marks omitted):

> [T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.
>
> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. We have stated, however, that [t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized[.]

The Supreme Court has held that "even a very minor criminal offense" committed in the presence of a law enforcement officer may provide probable cause for arrest. *Atwater*, 532 U.S. at 354; *accord McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019).

26

I am satisfied that defendant's eventual arrest was justified by probable cause.  Defendant "provided probable cause for his arrest by attempting to flee police."  *United States v. Mitchell*, 58 F. App'x 14 (4th Cir. 2003) (citation omitted).  Defendant also provided probable cause for his arrest by committing multiple traffic violations in view of Officer Galligan.  *See Bernard*, 927 F.3d at 805 ("'When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle.'") (quoting *Williams*, 740 F.3d at 312).

In sum, there is no basis on which to conclude that defendant was seized when Officer Galligan activated his emergency lights.  Nonetheless, even assuming that defendant was seized at that time, the seizure was justified by reasonable, articulable suspicion of wrongdoing.  And, defendant's arrest following his flight from law enforcement, which involved several apparent traffic violations, was amply supported by probable cause.

### 3.  Did Defendant Forfeit His Reasonable Expectation of Privacy in the Handgun by Discarding It?

According to the government, defendant forfeited the protection of the Fourth Amendment with respect to the firearm by discarding it in a public parking lot.  ECF 72 at 36–38.  Defendant argues that suppression of the firearm is appropriate because its discovery by the police resulted from Officer Galligan's unlawful seizure of defendant.  ECF 53 at 3–4; *see Leshuk*, 65 F.3d at 1111 ("[A] person does not voluntarily abandon property when the abandonment results from police misconduct . . . .").  But, I have concluded that defendant was not seized at the time he discarded the firearm.  Therefore, I may consider whether defendant abandoned the firearm without concern that the voluntariness of his forfeiture may have been vitiated by an unlawful seizure.

"'[C]apacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in

the invaded place.'"  *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)); *see also United States v. Zelaya-Veliz*, ___ F.4th ___, 2024 WL 650818, at *7 (4th Cir. Feb. 16, 2024); *United States v. Castellanos*, 716 F.3d 828, 833 (4th Cir. 2013).  "In order to [have] a legitimate expectation of privacy" in a place or thing, a defendant "[1] must have a subjective expectation of privacy, and [2] that subjective expectation of privacy must be objectively reasonably; in other words, it must be an expectation that society is willing to recognize as reasonable."  *Castellanos*, 716 F.3d at 832 (citations and internal quotation marks omitted).  "The burden of showing a legitimate expectation of privacy in the area [or item] searched rests with the defendant."  *Id.* (citing *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)).

"'The law is well established that a person who voluntarily abandons property loses any reasonable expectation of privacy in the property and is consequently precluded from seeking to suppress evidence seized from the property.'"  *United States v. Ferebee*, 957 F.3d 406, 412 (4th Cir. 2020) (quoting *Leshuk*, 65 F.3d at 1111); *see also United States v. Stevenson*, 396 F.3d 538, 546 (4th Cir. 2005).  "A finding of abandonment is based 'not [on] whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the articles alleged to be abandoned.'"  *United States v. Small*, 944 F.3d 490, 502 (quoting *United States v. Haynie*, 637 F.2d 227, 237 (4th Cir. 1980)).  "To determine whether the defendant maintains a reasonable expectation of privacy in an item, the court performs 'an objective analysis' which considers the defendant's actions and intentions."  *Small*, 944 F.3d at 502 (quoting *United States v. Davis*, 657 F. Supp. 2d 630, 647–48 (D. Md. 2009), *aff'd*, 690 F.3d 226 (4th Cir. 2012)).  "Intent [to abandon] may be inferred from words spoken, acts done, and other objective facts."  *Small*, 944 F.3d at 502 (citation and internal quotation marks omitted).

The evidence presented to the Court indicates that, during defendant's flight from law enforcement, he discarded the firearm at issue and it landed in a surface parking lot accessible to the public.   In my view, defendant's conduct in discarding the firearm was a voluntary abandonment under the Fourth Amendment.

To be sure, "[p]eople lose or misplace their [belongings] all the time." *Small*, 944 F.3d at 502.  And, these "ordinary mishaps do not constitute 'abandonments.'" *Id.* at 502–03.  However, the Fourth Circuit has remarked that, although "phones occasionally slip out of pockets, shirts do not accidentally fall off their wearers . . . and cars do not ditch themselves after a crash." *Id.* at 503.  So too, guns do not throw themselves out of car windows during a police pursuit.

There is no basis on which to conclude that defendant's alleged conduct in throwing the gun out of his car window—an act witnessed by several bystanders—was an involuntary act. Moreover, defendant lacked a reasonable expectation of privacy in the parking lot where he abandoned the firearm.   It follows that the seizure of the firearm was not in violation of the Fourth Amendment.

### 4.  Summary

Officer Galligan's initial attempt to stop defendant by activating his emergency equipment was not a seizure, because defendant ignored the officer and attempted to flee.  But, even if this attempted stop was a seizure, it was supported by Officer Galligan's reasonable, articulable suspicion that defendant had committed or was committing a crime.  As a result, defendant's abandonment of the firearm during his flight from Officer Galligan was not the result of an unlawful seizure.  Moreover, by discarding the firearm in a public parking lot, defendant forfeited his Fourth Amendment interest in the firearm.

Defendant was not seized until he stopped his car in Baltimore County. His subsequent arrest was justified by probable cause. Therefore, his custodial interrogation was not the fruit of an unlawful arrest.

In sum, there is no basis on which to conclude that the firearm or defendant's post-arrest statements were the fruit of an unlawful search or seizure.

## B.

As noted, defendant also seeks suppression of his post-arrest statements on the grounds that they "were obtained in violation of [his] privilege against self-incrimination, his right to counsel as guaranteed by the Fifth and Sixth Amendments to the United States Constitution, and . . . *Miranda v. Arizona*, 384 U.S. 436 (1966)." ECF 52, ¶ 3.[8] Moreover, defendant suggests that his statements were involuntary. *Id.* ¶ 5.

In response, the government asserts that, before being questioned by detectives at the BPD Homicide Unit, defendant knowingly and voluntarily waived his *Miranda* rights, as reflected in his signing of a written waiver. ECF 72 at 9; Government's Exhibit 16; ECF 72-4. And, the government maintains that there is no basis for concluding that defendant made any statements involuntarily. ECF 72 at 48–49.

I readily conclude that defendant's statements were knowing and voluntary, and obtained in accordance with *Miranda v. Arizona*, 384 U.S. 436. Therefore, I shall deny the Motion to Suppress Statements.

---

[8] Although defendant cites his Sixth Amendment right to counsel, that right is inapplicable here. It is well settled that a "criminal defendant's Sixth Amendment right to counsel attaches *after* judicial proceedings have been initiated against him . . . ." *United States v. Williamson*, 706 F.3d 405, 416 (4th Cir. 2013) (citing *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)) (emphasis added).

The Fifth Amendment provides, in part: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. In *Miranda*, 384 U.S. at 498, the Supreme Court established a prophylactic, procedural mechanism that safeguards a defendant's Fifth Amendment privilege against self-incrimination, applicable when that defendant is subject to custodial interrogation. *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) (reaffirming *Miranda* as "a constitutional rule"). "Before conducting a custodial interrogation of a suspect, law enforcement officials must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, and that he has the right to an attorney during questioning." *United States v. Wilder*, 304 F. Supp. 3d 464, 469 (D. Md. 2018); *see Berkemer*, 468 U.S. at 429; *United States v. Parker*, 262 F.3d 415 (4th Cir. 2001).

The government bears the burden of establishing, by a preponderance of the evidence, that defendant was advised of his rights and that his statements were made voluntarily. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986). But, "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *see Colorado*, 479 U.S. at 168–69 ("Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence."); *United States v. Robinson*, 404 F.3d 850, 860 (4th Cir. 2005).

Statements obtained from a defendant during custodial interrogation must be suppressed unless the government can prove, by a preponderance of evidence, that law enforcement officers adequately informed the defendant of his *Miranda* rights and obtained a knowing and voluntary waiver of those rights. *See Miranda*, 384 U.S. at 476–79; *see also Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010); *Dickerson*, 530 U.S. at 444; *Moran v. Burbine*, 475 U.S. 412, 421 (1986);

*Berkemer*, 468 U.S. at 429; *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *United States v. Ivey*, 60 F.4th 99, 112 (4th Cir. 2023); *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017); *United States v. Hargrove*, 625 F.3d 170, 177 (4th Cir. 2010), *cert. denied*, 565 U.S. 899 (2011); *United States v. Cardwell*, 433 F.3d 378, 389 (4th Cir. 2005); *United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002).

"The four warnings *Miranda* requires are invariable. . . ." *Florida v. Powell*, 559 U.S. 50, 60 (2010). But, the Fourth Circuit "has rejected attempts to add additional warnings to the time-tested *Miranda* formulation." *United States v. Clenney*, 631 F.3d 658, 668 (4th Cir. 2011); *see Harris v. Riddle*, 551 F.2d 936, 938–39 (4th Cir. 1977). And, the warnings may be oral or written. *United States v. Dire*, 680 F.3d 446, 474 (4th Cir. 2012), *cert. denied*, 568 U.S. 1145 (2013). Notably, there is no "'precise formulation of the warnings'" that is needed to satisfy *Miranda's* "'strictures.'" *Id.* (citation omitted).

It is well established that *Miranda* applies only in a custodial setting. *Miranda*, 384 U.S. at 441, 444; *see Yarborough v. Alvarado*, 541 U.S. 652, 660 (2004). The Supreme Court has observed: "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). In this case, it is clear that defendant was in custody at the relevant time.[9]

---

[9] "The *Miranda* custody inquiry is an objective test." *Yarborough*, 541 U.S. at 667; *see J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011); *United States v. Hashime,* 734 F.3d 278, 285 (4th Cir. 2013). "When determining whether an interrogation is custodial for purposes of *Miranda*, 'a court asks whether, under the totality of the circumstances, a suspect's freedom of action was curtailed to a degree associated with formal arrest.'" *United States v. Azua-Rinconada*, 914 F.3d 319, 325–26 (4th Cir. 2019) (citing *Hashime*, 734 F.3d at 282) (internal quotations, brackets, citation omitted); *see California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam); *see*

The inquiry into whether an individual has waived his *Miranda* rights has "two distinct dimensions." *Burbine*, 475 U.S. at 421; *see Edwards v. Arizona*, 451 U.S. 477, 482 (1981); *Cristobal*, 293 F.3d at 139. As the Supreme Court explained in *Burbine*, 475 U.S. at 421, the government must first show that the waiver of rights was "voluntary," *i.e.*, "that it was the product of free and deliberate choice rather than intimidation, coercion, or deception." Second, it must prove that the waiver was made knowingly, meaning that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*; *see also Tague v. Louisiana*, 444 U.S. 469, 470 (1980); *Butler*, 441 U.S. at 373. "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Burbine*, 475 U.S. at 421 (Citation omitted).

A waiver of rights may be express, either orally or in writing, or it may be implied from a defendant's actions and words. *Berghuis*, 560 U.S. at 384; *Cardwell*, 433 F.3d at 389. *Miranda* "does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights." *Berghuis*, 560 U.S. at 389. Therefore, a court may "infer a waiver of *Miranda* rights 'from the actions and words of the person interrogated.'" *Id.* at 387 (quoting *Butler*, 441 U.S. at 373). The court must consider all of the circumstances to determine if there is a waiver, express or implied. *Berghuis*, 560 U.S. at 389.

The *Berghuis* Court said, *id.*: "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with

---

*Mathiason*, 429 U.S. at 495; *Hargrove*, 625 F.3d at 178. Put another way, "'custodial interrogation'" means "'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Yarborough,* 541 U.S. at 661 (quoting *Miranda*, 384 U.S. at 444).

their exercise has made a deliberate choice to relinquish the protection those rights afford."  The Court also stated, *id.* at 388–89:  "[A] suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police."

In other words, to be a knowing and intelligent waiver, "'the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"  *Cristobal*, 293 F.3d at 140 (quoting *Burbine*, 475 U.S. at 421).  A statement that follows *Miranda* warnings will "[r]arely" be deemed involuntary.  *Dickerson*, 530 U.S. at 444.

In addition to ensuring that a defendant received the protections afforded by *Miranda*, a court must also determine whether any custodial statements were made voluntarily, in keeping with due process.  The Fourth Circuit has said that "[t]he test for determining whether a statement is involuntary under the Due Process Clause is whether the defendant's will has been overborne or his capacity for self-determination critically impaired because of coercive police conduct."  *Cristobal*, 293 F.3d at 140 (internal quotation marks and citations omitted).  "To determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, courts must consider the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation."  *Id*. (internal quotation marks omitted).

In particular, a court must consider "'whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence.'"  *United States v. Whitfield*, 695 F.3d 288, 301 (4th Cir. 2012) (quoting *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012)).  However, "'[e]ven where

threats, violence, implied promises, improper influence, or other coercive police activity exist,' . . . a confession may yet be voluntary . . . ." *Whitfield*, 695 F.3d at 301; *cf. Azua-Rinconada*, 914 F.3d at 324–25 (concluding that officer's statement, "'[O]pen the door or we're going to knock it down,'" "did not fatally infect the voluntariness of the consent" given by the defendant to a warrantless entry of his residence).

In addition, "'[p]loys to mislead a suspect or lull him into a false sense of security'" are not per se unconstitutional. *Giddins*, 858 F.3d at 883 (quoting *Illinois v. Perkins*, 496 U.S. 292, 297 (1990)). "Indeed, there is 'no duty to advise [a defendant] of the identity of the specific offense under investigation.'" *Giddins*, 858 F.3d at 883 (quoting *United States v. Braxton*, 112 F.3d 777, 784 (4th Cir. 2017)).

I am satisfied that defendant knowingly and voluntarily waived his *Miranda* rights after being advised of them by Detective Reichenberg. Government's Exhibit 14 at 4:17–6:12. As noted, Detective Reichenberg read each right aloud to defendant, and asked defendant if he understood. *Id.* Defendant indicated that he understood each right that was read to him. *Id.* He then signed an "Explanation and Waiver of Rights," which is also signed by Detective Reichenberg. Government's Exhibit 16; ECF 72-4. By signing this document, defendant acknowledged: "I have been advised of and understand my rights. I freely and voluntarily waive my rights and agree to talk with the police without having an attorney present." *Id.* At the time defendant executed the waiver, his handcuffs were removed; he had been provided with water; the officers were not in uniform; the officers' weapons were not on display or even in the room; and the hour of day was reasonable. The video recording of the interview does not reflect anything remotely approaching threats or coercion on the part of the detectives. *See* Government's Exhibit 13. Therefore, I conclude that defendant knowingly and voluntarily waived his *Miranda* rights.

I am also satisfied that defendant's statements during the interview were voluntary under the Due Process Clause.  There is no indication that defendant's will was in any way overborne by the detectives.  Indeed, it is clear that defendant wanted to talk to the police, was alert and oriented, astute in his caution, and persistent in wanting to know why he had been brought to the Homicide Unit.  His concern and curiosity evidence that he was mentally fit.

At the beginning of the interview, defendant acknowledged that he had been read his *Miranda* rights on another occasion.  Government's Exhibit 14 at 4:17–18.  Therefore, defendant had some familiarity with the conduct of a custodial interview.  *See Cristobal*, 293 F.3d at 140 (stating that a court evaluating the voluntariness of a confession should consider "the characteristics of the defendant").  The detectives' manner was friendly and they did not resort to intimidation or other forms of coercion.

At the hearing, defendant's counsel suggested that the police were aware that defendant had used marijuana, but failed to establish whether he was impaired by marijuana at the time. Defendant's counsel also suggested that the detectives made deceptive suggestions that they were not investigating defendant's possession of the firearm.  I am not persuaded.

To be sure, defendant acknowledged at the beginning of the interview that he had smoked marijuana at some point earlier in the day.  *Id.* at 4:7–11.  But, there is no rule that statements made by a person who has consumed an intoxicant are per se involuntary.  *See Boggs v. Bair*, 892 F.2d 1193, 1198 (4th Cir. 1989) ("[T]he mere fact that one has consumed alcoholic beverages does not mean that he is so intoxicated as to make his confession involuntary.").  In any event, it is clear from the video that defendant did not display any signs of intoxication during the interview: he was alert to his circumstances; gave coherent answers to the detectives' questions; and was careful to avoid making possibly incriminating statements to the detectives.  *See* Government's Exhibit

14.  Indeed, defendant remained guarded and volunteered minimal information in response to the detective's questions.  For example, defendant was guarded in talking to the police, as illustrated by his reluctance to disclose the address of the owner of the Acura.  *Id.* at 13:4, 6  ("I don't want to give — too much information.").

Moreover, I disagree that defendant's statements during the interview were extracted by the detectives' allegedly deceptive suggestion that they were not investigating his possession of the firearm.  Detective Reichenberg made it seem that the detectives' main concern was the investigation of the shooting of Sergeant Carrington.  *Id.* at 17:4–23; *see also id.* at 22:22–24  ("I don't know anything about the traffic stuff because I work homicide.  I could care less about traffic.").  Detective Reichenberg's statements about the purpose of the interview were apparently truthful.  *See United States v. Pelton*, 835 F.2d 1067, 1073 (4th Cir. 1987) ("Truthful statements about [a defendant's] predicament are not the type of 'coercion' that threatens to render a statement involuntary.").  Regardless, Detective Reichenberg also informed defendant that he would be charged with an offense related to his possession of the handgun, stating, Government's Exhibit 14 at 22:10–16, 19–20:

> I will tell you this, you're under—you are being charged with a handgun.  It's a misdemeanor.  All you're being charged with is a handgun violation that I know of right now . . . and I guess, a little bit of weed.

Indeed, it was only *after* informing Brooks that he would be "charged with . . . a handgun violation," *id.* at 22:16–17, that Detective Reichenberg stated: "Let me ask you this.  Why do you have a gun in the car? Just because it's Baltimore?"  *Id.* at 24:11–13.  Defendant answered "Yeah."  *Id.* at 24:14–15.   By that time, defendant was on notice that any statements he made concerning the handgun could be incriminating.

Therefore, I see no factual basis for defendant's contention that the detectives attempted to elicit incriminating statements about the firearm by "lull[ing] [defendant] into a false sense of security" about the purpose of their questioning. *Giddins*, 858 F.3d at 883 (internal quotation marks and citation omitted).

In sum, I am satisfied that the interview of defendant was preceded by a proper waiver of his *Miranda* rights. And, I see no basis on which to conclude that defendant's will was "overborne or his capacity for self-determination critically impaired." *Cristobal*, 293 F.3d at 140 (internal quotation marks and citation omitted). Therefore, I shall deny the Motion to Suppress Statements. ECF 52.

## IV.    Conclusion

For the foregoing reasons, I shall deny the Motion to Suppress Evidence (ECF 53) and the Motion to Suppress Statements (ECF 52). An Order follows, consistent with this Memorandum Opinion.


Date: March 14, 2024                                          /s/
                                                    Ellen Lipton Hollander
                                                    United States District Judge